Mattie Berna J. KNIGHT,
Appellant/Cross–
Appellee,

v.

GEORGETOWN UNIVERSITY, et al.,
Appellees/Cross–Appellants.

No. 96–CV–792, 96–CV–825, 96–CV–995.

District of Columbia Court of Appeals.

Argued May 26, 1998.
Decided Feb. 11, 1999.

John E. Scheuermann, with whom Karen L. Terhune, Washington, DC, was on the brief, for appellees/cross-appellants.

Before STEADMAN and REID, Associate Judges, and BELSON, Senior Judge.

STEADMAN, Associate Judge:

After almost thirty years of employment, Mattie Berna J. Knight, an African American registered nurse, was discharged by Georgetown University Hospital when it closed the blood transfusion service unit which Ms. Knight supervised. She brought suit challenging her discharge on grounds both of race discrimination and promissory estoppel. A jury found in Georgetown's favor on Ms. Knight's race discrimination claim, but awarded her $90,000 on the promissory estoppel theory. Both parties appealed to this court.

Ms. Knight challenges several evidentiary rulings by the trial court, principally asserting that the court erroneously prevented her from fully presenting the evidence necessary to rebut two of Georgetown's stated nondiscriminatory reasons for her termination. She also asserts errors in the trial court's instructions and in the award of costs. Georgetown in its cross-appeal argues that the trial court, rather than the jury, should have decided the promissory estoppel claim and that the award of $90,000 was excessive. We find error in the trial court's award of costs and remand for a redetermination of that award. In all other respects, we affirm the judgment.

## I. FACTS.

The following basic facts were essentially undisputed. Ms. Knight had been employed as a nurse at Georgetown University Hospital since 1965. In 1980, she was asked to help organize the Transfusion Service Unit in the hospital's Department of Laboratory Medicine, and she remained as the nursing supervisor until the unit was eliminated as part of a reorganization in July 1994. The unit provided certain types of blood transfusions on an out-patient basis and arranged blood collection from donors. Shortly before the unit was eliminated, it consisted of four

Robert C. Seldon, Washington, DC, for appellant/cross-appellee.

employees: Ms. Knight, two white registered nurses who worked under Ms. Knight's supervision, and an African American receptionist.

In February 1993, Ms. Knight attended a meeting where the reorganization of the unit was first discussed. Immediately after this meeting, she was assured by Dr. Ronald S. Sacher, the director of the department and formerly her immediate supervisor, that the hospital would continue to provide her with a supervisory nursing position even after the reorganization was complete.[1] The hospital proceeded to reorganize the unit in two phases. In early 1994, the hospital transferred all blood-collection activities to contractors from the American Red Cross and laid off two of the unit's employees: the black receptionist and one of the white nurses. Although the nurse found a comparable position elsewhere in the hospital, the receptionist did not.

Ms. Knight and the remaining white nurse continued to provide blood-transfusion services. In June 1994, a hospital official told Ms. Knight that she and the remaining nurse would be laid off when blood-transfusion responsibilities were transferred to another department in the hospital, and spoke with her about other nursing positions she could fill after the unit was eliminated. Ms. Knight testified that she did not apply for certain positions because they were not commensurate to her salary and high level of experience; she did not apply for other positions closer to her experience level because, in many instances, she was not aware of openings, and in any event she believed that Dr. Sacher would find a way to keep her on staff in a supervisory position. The nurse whom she supervised applied for and received one of the less-senior positions that Ms. Knight had declined. On July 15, 1994, Ms. Knight received formal written notice that she would be laid off that day.

Ms. Knight filed a five-count complaint against Georgetown University and two individual defendants, Dr. Sacher and another doctor, S. Ronald Sandler, M.D., who was the Director of Blood Services and her immediate supervisor at the time of her layoff. Count I alleged that Georgetown racially discriminated against Ms. Knight in her employment in violation of the District of Columbia Human Rights Act ("DCHRA"), see D.C.Code § 1–2512 (1992), and Counts II and III alleged that each individual defendant aided or abetted the racial discrimination, see D.C.Code § 1–2526 (1992).[2] Counts IV and V alleged common-law claims of breach of contract and promissory estoppel against Georgetown alone, based on Dr. Sacher's representations, in his official capacity, that the hospital would provide Ms. Knight with comparable employment after the Transfusion Service Unit closed. She sought reinstatement as well as compensatory damages of $1,134,000 and punitive damages of $1,500,000.

The basic theory of the DCHRA claim was disparate treatment: Ms. Knight alleged that after the transfusion unit of the Department of Laboratory Medicine was eliminated, Georgetown discriminated against her because of her race by failing to place her in another supervisory nursing position elsewhere in the hospital, as it had done for the two white nurses in the unit. At trial, she testified that of the four employees in the transfusion unit, the two white registered nurses obtained jobs elsewhere in the hospital but the two African American employees, Ms. Knight and the receptionist, did not. Ms. Knight also introduced statistical evidence designed to show that for several years African Americans had been disproportionately affected by layoffs in the entire Department of Laboratory Medicine. This evidence took the form of two stipulated graphs—one showing changes in the percentages of African Americans, Caucasians, and other groups in the department, and the other showing changes in absolute numbers—as well as a stipulation that in 1993 twelve of the thirteen employees laid off in the department were African American. Ms.

---

1. Dr. Sacher recalled promising that he would do everything he could to keep Ms. Knight on staff. He testified that he did not remember his exact words during this conversation, but that he had no reason to doubt the accuracy of Ms. Knight's recollection.

2. Both Drs. Sacher and Sandler are white men.

Knight also testified to personal instances of what she perceived as racial bias, including various slights of both a personal and professional nature.

Georgetown defended against the race-discrimination charges by identifying nondiscriminatory reasons for closing Ms. Knight's unit and not placing her in a comparable job. The hospital had been losing money, and, like many teaching hospitals in recent years, felt pressure to cut costs by discontinuing services or contracting out to third-party providers. Additionally, the Red Cross was trusted to provide more efficient blood-collection services than the hospital could provide internally. Georgetown maintained that Ms. Knight had been offered assistance in finding a new job and that she was free to apply for any number of positions, but that she never did, unlike the white nurses who found jobs elsewhere in the hospital. Georgetown argued that it did not breach any contract because Ms. Knight was an at-will employee and, with regard to promissory estoppel, she could not reasonably have relied on any representations that the hospital would find another position for her.

Ms. Knight responded to Georgetown's defense by trying to show that its stated nondiscriminatory reasons were pretextual. She did so in two ways. First, as to the hospital's reasons for closing the unit, she questioned the magnitude of the hospital's recent $4 million loss in light of its net revenues and assets, as well as those of the university as a whole. She also attempted to question the safety of Red Cross blood-collection procedures, although the trial court precluded her from doing so. Second, with regard to her failure to apply for other jobs in the hospital, as noted above, Ms. Knight testified that she did not apply for these positions because she did not feel they were commensurate to her experience and salary history, and she trusted Dr. Sacher to make good on what she perceived as his promise to find her another supervisory nursing position. After her layoff, she did not reapply for any positions at Georgetown primarily because she felt too

embarrassed and humiliated by her experience to return.

After a six-day trial and four days of deliberation, the jury returned a verdict for Georgetown and the individual defendants on the racial discrimination counts. However, the jury found for Ms. Knight on her claim of promissory estoppel and awarded compensatory damages of $90,000.[3]

We address in turn each of the issues raised by the parties on appeal.

## II. EVIDENTIARY RULINGS.

### A. Demonstrating Pretext.

Ms. Knight contends that the trial court improperly restricted her ability to question hospital witnesses about their reasons for eliminating her unit. As noted above, Georgetown maintained that it eliminated the unit because of financial pressures at the hospital and the prospect that the Red Cross would provide superior blood-collection services. Ms. Knight wanted to show that the second of these reasons was pretextual by questioning Dr. Sandler about the Red Cross's safety record in the Washington area. As for the first reason, she wanted to question a witness about the hospital's relationship with other components of Georgetown University to show that its financial troubles were far less significant than it claimed in light of the university's overall financial situation.

### 1. *Legal Standards.*

As a general principle, the trial court is entrusted with "broad discretion" in regulating "the substance, form, and quantum of evidence which is to be presented to a jury." *Hawkins v. United States*, 461 A.2d 1025, 1033 (D.C.1983) (quoting *(William T.) Johnson v. United States*, 452 A.2d 959, 960 (D.C.1982) (per curiam)). Likewise, as we recently observed, "the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision."

---

**3.** The trial court had disposed of the breach-of-contract claim by granting judgment as a matter of law to Georgetown and also precluded the jury

from considering whether to award punitive damages. Ms. Knight does not contest either of these trial court rulings on appeal.

*(William A.) Johnson v. United States,* 683 A.2d 1087, 1095 (D.C.1996) (en banc), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997); *see also Roundtree v. United States,* 581 A.2d 315, 328 (D.C.1990) (evidentiary rulings on relevancy will be overturned only upon a showing of "grave abuse").

 We must apply these general principles in the specific context of an employment-discrimination case, which involves a three-part allocation of proof. First, the plaintiff must establish a prima facie case of unlawful discrimination. *See St. Mary's Honor Ctr. v.. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citing, *inter alia, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993).[4] "Once that has been done, a rebuttable presumption arises that the employer's conduct amounted to unlawful discrimination." *Arthur Young, supra,* 631 A.2d at 361. Second, the employer bears the burden of rebutting this presumption " 'by articulating some legitimate, nondiscriminatory reason for the employment action at issue.' " *Id* . (quoting *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights,* 515 A.2d 1095, 1099 (D.C.1986)); *see also St. Mary's, supra,* 509 U.S. at 506–07, 113 S.Ct. 2742. Third, once the employer offers a nondiscriminatory reason, it becomes the employee's burden to demonstrate by a preponderance of the evidence that the reason is pretextual. *See Arthur Young,* 631 A.2d at 361; *see also St. Mary's, supra,* 509 U.S. at 507–08, 113 S.Ct. 2742. The employee must be afforded what has been termed a "full and fair opportunity" to show that the employer's stated nondiscriminatory reason for treating her as it did was actually a pretext for unlawful discrimination. *See St.*

*Mary's, supra,* 509 U.S. at 507, 113 S.Ct. 2742; *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas, supra,* 411 U.S. at 805, 93 S.Ct. 1817. "Although the burden of production may shift from the employee to the employer and back to the employee, the employee retains the ultimate burden of persuading the finder-of-fact that the employer acted with discriminatory animus." *Blackman, supra* note 4, 694 A.2d at 868.[5] The issue before us concerns the third step, that the plaintiff show the employer's stated reasons for the adverse action to be pretextual.

*2. Red Cross Blood–Collection Procedures.*

 Dr. Sandler, who arranged the contracting of the hospital's blood-collection services to the Red Cross, was called by Ms. Knight in her case in chief and asked about a consent decree which mandated changes in the way the Red Cross collected and processed blood. Dr. Sandler acknowledged that he was aware of a consent decree, but before Ms. Knight could ask specific questions about it counsel for the defendants objected and, at a bench conference, requested a proffer of relevance. Ms. Knight represented that the consent decree arose from litigation over the quality and safety of the Red Cross's Washington-area blood-collection procedures, and maintained that this information was relevant to the hospital's explanation that transferring her unit's responsibilities to the Red Cross would improve the efficiency and quality of patient care. The trial court precluded questioning on the consent decree "as remote and vastly outweighed by the distraction and the road down which we have to go to find out all about Red Cross blood collection procedures

---

**4.** A prima facie case consists of proof that (1) the plaintiff belongs to a protected class, (2) he or she is qualified for the employment position at issue, (3) he or she was the subject of an adverse employment decision, and (4) race was a substantial factor in the adverse action. *See Blackman v. Visiting Nurses Ass'n,* 694 A.2d 865, 868–69 (D.C.1997); *Arthur Young, supra,* 631 A.2d at 361; *see also St. Mary's, supra,* 509 U.S. at 506, 113 S.Ct. 2742.

**5.** The Supreme Court cases cited in the text construed not the DCHRA but rather Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1994). Nevertheless, "[t]he anti-discrimination provisions of both statutes are substantially similar," *Arthur Young, supra,* 631 A.2d at 361 n. 17, and when interpreting the DCHRA we have long referred to federal cases interpreting Title VII, *see id.* (citing examples).

as compared with ... Georgetown's procedures." [6] The trial court similarly sustained an objection to Ms. Knight's question about Red Cross compliance with safety regulations when cross-examining Dr. Sandler during the defendants' case in chief.

■ We cannot say that the trial court abused its discretion in ruling that the quality of Red Cross blood-collection procedures was too collateral to the central issue and that this employment-discrimination case might degenerate into a trial of the Red Cross's safety record. Indeed, in *Smith v. Executive Club, Ltd.*, 458 A.2d 32, 42 (D.C. 1983), we reversed a trial court for failing to limit cross-examination sufficiently so as to prevent a "trial within a trial" on collateral issues. Although a plaintiff alleging racial discrimination in the workplace must be given a full and fair opportunity to prove that the employer's stated nondiscriminatory reasons are pretextual, the trial court is not deprived of its discretion over the manner in which the plaintiff proves his or her case. *See Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1553, 1554–55 (11th Cir.1995) (upholding trial court's exclusion, as more prejudicial than probative, of EEOC determination letter which was offered to show that employer's stated nondiscriminatory reason was pretextual).

This particular stated reason—that transferring the Transfusion Service Unit's responsibilities to the Red Cross would improve quality and efficiency—could reasonably be deemed a collateral issue under the circumstances and the trial court could restrict the scope of inquiry. Insofar as relevant to the claim of race discrimination, the ultimate "discharge" here was not so much the hospital's reorganization of its blood services and transfer of responsibilities to the Red Cross, but rather its subsequent alleged failure to provide Ms. Knight with comparable employment in another department, as the hospital managed to do for the two white nurses in the unit. Ms. Knight's complaint maintained that Georgetown discriminated not by closing the unit in the first place but by "failing or refusing to employ [her] in a comparable position at GU Hospital after the reorganization and termination of the Transfusion Services as it did for the white nurses on the staff ...." Thus, the fact finder would be most unlikely to conclude that Georgetown University discriminated against her on the basis of her race because it decided to contract with the Red Cross in the first place notwithstanding any safety concerns; the focus would be on the alleged discrimination that occurred in failing to place her in a supervisory nursing position elsewhere in the hospital after responsibility for her unit's services were assumed by other entities.[7]

6. Although the defendants had not yet presented any evidence of their own at this point in the trial, they had stated their nondiscriminatory reasons in their motion for summary judgment and in the joint pretrial statement. The appellees did not then, and do not now, argue that Ms. Knight's attempt to prove pretext was in any way premature. As one text explains, "[t]he *allocation* of proof does not dictate the *order* of proof.... Usually the employer's stated legitimate reason for its actions will become known during discovery, and the plaintiff's case-in-chief will contain not only evidence of the prima facie case but also evidence that goes to the issue of pretext." 1 BARBARA LINDEMANN & PAUL GROSSMAN, EMPLOYMENT DISCRIMINATION LAW 37 (3d ed.1996).

7. In any event, for largely the same reasons, any error here would have been harmless because we believe, with fair assurance, that the exclusion of this evidence did not substantially sway the jury's verdict on the DCHRA counts. *See R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin*, 596 A.2d 530, 538–40 (D.C.1991) (defining civil harmless error). Why the hospital might have chosen the Red Cross to collect blood despite a history of safety problems sheds no light on why the hospital would not help Ms. Knight find a new job. *See Koger v. Reno*, 321 U.S.App. D.C. 182, 189, 98 F.3d 631, 638 (1996) (holding that any error in exclusion of statistical evidence in disparate-treatment case would be harmless because of marginal probity to chief theory of case); *Ruby v. Springfield R–12 Pub. Sch. Dist.*, 76 F.3d 909, 912 (8th Cir.1996) (holding that any error in excluding evidence offered to rebut employer's nondiscriminatory reason was harmless because "no reasonable fact finder could, merely on these comments, find that [the employer's] reasons for adverse action were pretextual for discrimination"); *cf. Glass v. Philadelphia Elec. Co.*, 34 F.3d 188, 195 (3d Cir.1994) (finding harmful error where it was "highly probable that the evidentiary rulings affected the outcome of the case"); *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1105 (8th Cir.1988) (finding harmful error where cumulative effect of evidentiary rulings limited employee to proving employer's

### 3. *The Hospital's Financial Relationship with the University.*

█ Likewise, we find no error in the trial court's limitation of Ms. Knight's cross-examination of a witness concerning the hospital's financial relationship with the university. Mr. Dan Oldani, the hospital's chief operating officer, had testified on direct examination about the hospital's recent operating loss of $4 million and explained that the elimination of the Transfusion Services Unit was partially a response to financial pressures. On cross-examination, Ms. Knight asked about the hospital's net revenue and assets—which ranged in the hundreds of millions of dollars—in an effort to show that the $4 million loss was relatively insignificant. Ms. Knight then elicited Mr. Oldani's acknowledgement that the hospital was one component of Georgetown University Medical Center, which was itself part of the entire university structure. When Ms. Knight proceeded to ask about other Georgetown institutions, counsel for the defendants objected.

At a bench conference, the trial court expressed concern that the questioning on the university's net resources and assets beyond the hospital was relevant mainly to calculating punitive damages, which Ms. Knight had been precluded from seeking. Counsel for Ms. Knight explained that he "was only going to try and make clear that the hospital is not a separately incorporated entity and doesn't have to be treated separately for accounting purposes. That was it." The trial court stated, "All right, we're done with money," and sustained the objection.

We see no abuse of discretion in this ruling. Ms. Knight adequately made her point that the hospital's income losses could be viewed in the perspective not only of the hospital's own assets and revenues but of the hospital as part of a medical center and a university as a whole, and thus cannot be said to have been deprived of a sufficiently full and fair opportunity to probe Georgetown's explanation that financial pressures required the elimination of her unit. Moreover, as with the safety of the Red Cross's blood-collection procedures, the financial situation of the hospital explained only why the unit was eliminated in the first place, not why Ms. Knight did not obtain alternative employment. Even Ms. Knight's complaint recognized that a purpose of the reorganization was to reduce costs. Her chief argument then, as now, was that once the reorganization was underway the hospital proceeded to treat the two white employees differently from the two African American employees. The accounting practices of the university would have little to say about Ms. Knight's theory of disparate treatment, and the trial court did not abuse its discretion in curbing Ms. Knight's further cross-examination on this point.

### B. Other Evidentiary Rulings.

Ms. Knight contests five other evidentiary rulings which we may dispose of more briefly. As noted above, the trial court has "broad discretion" over "the substance, form, and quantum of evidence" presented at trial, *Hawkins, supra,* 461 A.2d at 1033, and we detect no abuse of discretion in any of these rulings.

█ First, while the trial court prevented Ms. Knight from giving anecdotal accounts of the 1993 layoffs in her department, this same information was admitted in the form of statistical charts and the stipulation that twelve of the thirteen employees laid off that year were African American. The trial court concluded that Ms. Knight's personal testimony about the 1993 layoffs would be unduly prejudicial if given in isolation. Instead, the trial court urged the parties to develop charts showing changes in the department over several years, so that "the jury gets the demographics of the department, and the jury is not getting mortar shells lobbed into the jury box because it's the surprising and explosive testimony that leads to undue prejudice." The parties worked together and developed a set of mutually-acceptable charts and a stipulation along the lines suggested by the trial court. While the trial court may have been perceived as overly directive with regard to how Ms. Knight should present her statistical and anecdotal evidence, we cannot say that the court abused its discretion in urging the

"discriminatory intent solely from the facts of his own discharge").

parties to develop mutually acceptable charts showing pertinent employment and layoff statistical data for the Department of Laboratory Medicine, and a stipulation regarding the African American race of twelve of the thirteen employees terminated in the department. *Cf. Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974) (evidence of racial discrimination based substantially on statistics involving thirteen individuals was "too fragmentary and speculative to support a serious charge in a judicial proceeding"). We also find no abuse of discretion in allowing a hospital official to explain why these thirteen were laid off and how they were selected.

▪ Second, Ms. Knight argues that the trial court committed reversible error by admitting certain statistical evidence that Georgetown withheld during discovery. These statistics tended to undermine the plaintiff's argument that African Americans were disproportionately affected by the layoffs. The decision to impose discovery sanctions is within the broad discretion of the trial court, *see, e.g., Vincent v. Anderson,* 621 A.2d 367, 373 (D.C.1993), and we cannot say the court abused its discretion by deciding not to impose the severe sanction of exclusion. The trial court admitted the statistics only after they were incorporated into the plaintiff's own statistics in the form of stipulated charts.

Third, with respect to evidence of Dr. Sacher's South African national origin, excluded by the trial court, *see (William A.) Johnson, supra,* 683 A.2d at 1095, this precise information came before the jury during Ms. Knight's direct testimony when she alluded to Dr. Sacher's "hometown in South Africa," in what the trial court found to be a deliberate circumvention of his ruling.

▪ Fourth, there was no error in the defendants' introduction of excerpts from Ms. Knight's deposition. Under Superior Court Civil Rule 32(a)(2), "so far as admissible under the Rules of Evidence applied as though the witness were then present and testifying," the deposition of a party "may be used by an adverse party for any purpose." Rule 32 does not require that the contents of the deposition be against the declarant's interest or that the declarant be unavailable, and neither do the rules of evidence regarding admissions of a party opponent. *See* FED. R. EVID. 801(d)(2) (classifying admissions of a party opponent as non-hearsay); 2 MCCORMICK ON EVIDENCE § 254, at 143 (John William Strong ed., 4th ed.1992); 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 801.20[1]-[3] (Joseph M. McLaughlin ed., 2d ed.1998).

▪ Finally, Ms. Knight argues that evidence of severance payments to her was irrelevant because Georgetown was contractually bound to make such payments. Georgetown responds that the information was relevant as demonstrating that Ms. Knight was treated no differently from any laid-off employee and was not singled out for poor treatment because of her race. We see no "grave abuse" of discretion in admitting the evidence. *See Roundtree, supra,* 581 A.2d at 328.

### III. JURY INSTRUCTIONS.

Next, Ms. Knight argues that the trial court committed two reversible errors when it instructed the jury on her employment-discrimination claims under the DCHRA. First, she contends that the trial court should have given a series of detailed instructions she submitted on how to evaluate circumstantial and statistical evidence,[8] rather than the actual instruction "not [to] be concerned about whether the evidence is 'direct' evidence, statistical evidence, or 'circumstantial' evidence" and to "consider all of the evidence, direct and circumstantial." Second, she contends that the trial court gave an erroneous instruction on how to evaluate the

---

8. For example, one of these proposed instructions read,

Statistical evidence is sometimes provided through complex analyses, but it is equally important when it is comprised of elementary percentage comparisons of the employer's workforce. Evidence of this sort showing a wide disparity between the number of minority and nonminority members in an employer's workforce is quite relevant evidence in the trial of an individual's employment discrimination claim.

defendants' liability when it summarized her DCHRA claims as follows: "The plaintiff claims that Georgetown, as aided and abetted by the defendant doctors, terminated her employment because of her race, and she seeks money damages based upon these claims." Although the court proceeded to explain the elements of each claim against each defendant, Ms. Knight argues that regardless of what followed, this opening sentence told the jury to predicate Georgetown's liability only upon a finding that each of the two doctors was liable, and also that it narrowed the jury's focus from behavior by others at Georgetown to the behavior of only these two doctors.

We face a threshold question of whether these objections have been adequately preserved. Rule 51 of the Superior Court Rules of Civil Procedure provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." As we have explained the substantially similar rule for criminal trials, "objections to jury instructions must be specific enough to direct the judge's attention to the correct rule of law; a party's request for jury instructions must be made with sufficient precision to indicate distinctly the party's thesis." *Russell v. United States,* 698 A.2d 1007, 1012 (D.C.1997) (interpreting Super. Ct.Crim. R. 30). A party's failure to register a sufficiently precise objection limits the scope of our review to plain error. *See District of Columbia v. Banks,* 646 A.2d 972, 978 (D.C.1994).

Among her thirty-one proposed jury instructions, Ms. Knight submitted circumstantial-evidence instructions and a liability instruction comparable to the ones she now claims should have been given. The trial court prepared its own proposed jury instructions which it submitted to both parties for comment. Ms. Knight then submitted eight pages of "objections, suggestions, and responses to the Court's proposed jury in-

structions," but never addressed the two matters she now presents to us. These written objections made no reference whatever to any instruction on circumstantial and statistical evidence. The comments on the DCHRA instructions preserved the overview of the claims against all three defendants with only minor suggested changes.[9]

In a footnote at the very end of this submission, Ms. Knight announced that she "respectfully reserves all objections to any and all deviations and departures from the proposed jury instructions which she submitted in the parties' Joint Pre–Trial Statement. Nothing in this Response may be taken or construed as an admission or statement to the contrary." We think that Rule 51 may not be circumvented so easily. A sweeping objection to "any and all deviations and departures from" a party's own proposed jury instructions does not "stat[e] distinctly" the particular matter now before us, as required by Rule 51. *See Green v. United States,* 718 A.2d 1042, 1056 (D.C.1998) (purpose of the substantially similar criminal rule is "ill-served by a party's unexplained insistence on its own proffered instruction").

Ms. Knight argues that she never explicitly objected because the trial court told both parties to stop objecting because all objections were preserved. We do not read the record this way. The trial court announced that it would circulate proposed final instructions. Counsel for Ms. Knight then stated, in open court, "What you want are objections and proposed changes to the instructions, as I understand it," to which the court replied, "Correct." The trial court further elaborated that he did not want to hear from the parties simply that they would prefer their initial proposed instructions; however, if counsel felt that particular instructions were "flatly wrong" and would require the parties "to retry this case next year for another $10,000, ... those you'd better holler about." The trial court made clear that it invited objections of the magnitude now asserted by Ms. Knight, i.e., potentially reversible errors.

9. These suggestions were (1) changing the phrase "aided and abetted" to "aided, abetted, or invited," and (2) changing "terminated her because of her race" to "terminated her career at Georgetown, by discharging the plaintiff and in failing to re-employ her, because of her race."

■ The trial court did say, "For the record it's true that every single objection that any party has made and anything I've done by way of legal instructions is preserved." But we see nothing in the record to indicate that Ms. Knight, with the particularity required by Rule 51, ever objected to the instructions which she now claims were erroneous. A general objection that a party's own proposed instructions would be superior does not suffice without further explaining precisely what aspects of the trial court's proposed instructions are erroneous.

■ Given the standard of review, and looking at the trial record and jury charge as a whole, see *United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); *Moss v. Stockard*, 580 A.2d 1011, 1027 (D.C.1990), we detect no plain error, if indeed error at all, in the jury instructions given. The jury was instructed to consider all the evidence, whether direct, circumstantial, or statistical. Statistical evidence was principally presented here, and Ms. Knight's lawyer explained without contradiction in summation, "the law does not require as proof of intentional race discrimination that something horrible be uttered at the moment someone is let go" because "[p]eople are able to disguise their emotions and their feelings." For that reason, "the law allows us to ... look to evidence that is direct and circumstantial, to look to statistics, to background evidence, to see how other similar minorities were treated."

■ As for the DCHRA instruction, we would be hard-pressed to find any error at all in what was intended as a simple overview of the plaintiff's claims against all three defendants. When read in isolation, the sentence identified by Ms. Knight may appear to conflate the liability of the aiders and abettors with the liability of the employer. But it was not given in isolation. The trial court proceeded to describe the claims against each defendant and drew a clear distinction between the liability of an employer and the liability of an aider and abettor. Jurors are presumed to follow their instructions, *see*, *e.g.*, *Safeway Stores, Inc. v. Buckmon*, 652 A.2d 597, 605 n. 5 (D.C.1994), and there is no reason to believe that they would disregard the trial court's detailed instructions on the elements of each claim against each defendant.

IV. GEORGETOWN'S CROSS-APPEAL.

We now turn to Georgetown's cross-appeal challenging the $90,000 verdict in favor of Ms. Knight on the ground of promissory estoppel.

A. Promissory Estoppel: Who Decides?

■ Georgetown argues that promissory estoppel was an equitable issue which should have been decided by the trial court alone after the jury returned its verdict on the other counts of the complaint. *See Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) ("legal claims involved in the action must be determined prior to any final court determination of [plaintiff's] equitable claims"). Georgetown does not demand a new trial but asks simply that we remand so that the trial court may make independent factual findings, with the understanding that such findings are for it alone to make and not for the jury. *See Hurwitz v. Hurwitz*, 78 U.S.App. D.C. 66, 69, 136 F.2d 796, 799 (1943) (prescribing remand rather than new trial as appropriate remedy); 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2887, at 475–76 (2d ed.1995) (same, quoting *Hurwitz* ). We see no purpose in such a remand, since, even assuming that the issue was one for the court and that Georgetown had not waived any right to a court decision (the latter, at least, a doubtful proposition), we think it reasonably plain that the trial court would have ruled against Georgetown as did the jury.

The trial in this case lasted six days. Once all the evidence was presented, the trial court reviewed with counsel its proposed final jury instructions. After they discussed the proposed instruction on remedies for the promissory-estoppel claim, counsel for Georgetown raised an additional concern:

> MR. SCHEUERMANN: Well, there is another question in this area, Your Honor. And that is, it's pled in the complaint as equitable estoppel. And if my basic law

school memory serves me correctly, under *Beacon Theaters [Theatres] versus West-over*,[10] where you have mixed legal and equitable claims, the factual issues go to the jury on the legal claims, but the decision comes back to the Court on the equitable claims.

MR. SELDON [counsel for Ms. Knight]: Estoppel is now an action of law, I believe, Your Honor.

THE COURT: Well, you sent me to the books often, and now you send me again. You'll still take the draft [jury instructions] I've worked up thus far and have at it, and then, we'll continue to talk.

MR. SELDON: I will also say that I believe that that is an issue that was waived in the pretrial by the defendants.

In fact, since pretrial the plaintiff and the defendants had behaved as if promissory estoppel were a jury question, submitting proposed jury instructions on that count with the joint pretrial statement and presenting evidence on the theory to the jury. The parties were conspicuously unprepared to argue this point at the time it was raised, and the trial court declined to rule on the matter until after further research. Nevertheless, the trial court stated

> that given issues of reasonableness and the fact-bound nature of the determination on [the] promissory estoppel claim, that at a minimum, it is healthy for me to get an advisory fact-finding from the jury. And if that, in fact, becomes the verdict under law, so be it.

The record before us discloses no further discussion of this matter until after the jury charge, which included the elements of promissory estoppel. After the jury retired to deliberate, the trial court invited the parties to submit additional briefing on the question of whether promissory estoppel was for the jury to decide.

> If you want to rest, see what the jury does—I left you in limbo on that subject. I said in any event I'd take the jury's result for an advisory opinion. You know advisory juries are favored especially in fact-bound questions.

But it may be you'll convince me that as a matter of law I'm not allowed to let the jury decide the estoppel claim. But so far I'm proceeding on the assumption that the jury will decide it, given the fact-bound quality of the decision as presented. So there we are.

The proceedings concluded for the day without any further discussion of this matter.

The jury returned a verdict against Ms. Knight on all counts except for the promissory-estoppel claim, for which it awarded her $90,000 in damages. Georgetown then requested the trial court to make findings of fact and conclusions of law from what it deemed an advisory verdict. Ms. Knight contended that the jury verdict was final because Georgetown's position had not been raised in a timely manner and was substantively incorrect.

A strong case can indeed be made for the proposition that Georgetown waived any right it had to a court ruling on its promissory estoppel claim by not raising the issue until the final stages of discussion of jury instructions. Plaintiff's complaint demanded a jury trial on all issues. As already indicated, so far as we can determine, nothing in the answer or pretrial statement or conference or, indeed, of the evidentiary phase of the trial itself gave any indication of Georgetown's present position. The defendants objected to plaintiff's proposed instructions on estoppel and offered a substitute instruction of their own, a strong suggestion that the jury was expected to decide the issue. Not until the final discussions on jury instructions at the end of all the evidence was the issue apparently raised for the first time. Such tardiness is hardly conducive to the orderly pretrial management process contemplated by Super. Ct. Civ. R. 16. See 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, § 1525, at 250 & n. 26 (2d ed.1990) (pretrial conference "may consider ... the right of a party to a jury trial," citing cases).

We note that while the Seventh Amendment guarantees a right to a trial by jury on legal claims, it has been said that "[a] defen-

---

10. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

dant has no constitutional right to a trial by the court without a jury." *Hurwitz, supra,* 78 U.S.App. D.C. at 68–69, 136 F.2d at 798–99. In *Washington Metropolitan Area Transit Authority v. L'Enfant Plaza Properties, Inc.,* 448 A.2d 864, 869–70 (D.C.1982), we held that the defendants waived their right to a jury trial by failing to assert that right until after opening statements and direct and cross-examination of a witness; it is not readily apparent why any asserted right to a court trial should be treated differently. However, we need make no definitive ruling on the timeliness issue, because, as already indicated, we do not think a reversal or remand is required in any event.

The trial court began its ruling with the observation that "[c]ertainly the case of the case in the pretrial papers contemplated resolution by the jury of the promissory estoppel claim ." The trial court stated,

> [I]n my judgment what the jury has done has found favorable to the Plaintiff on a claim which all along struck me as founded and significant in the context of the human and working relationships.

> The jury very reasonably took a measure of damages short of any sinecure and said a very fine woman labored long and hard and when the time came for the unit to be closed she served as requested to the last on behalf of patients.

> I think the jury has also found that Ms. Knight is very capable and if she wanted to go and work she could work and find very healthy remunerative employment; that the loss of the job at Georgetown was a shock and the verdict is intended to tide her over into transition.

**11.** We do not perceive any undermining of the trial court's ruling by its indication, moments later, that it would have probably followed the jury the other way. If the jury had returned a verdict against Ms. Knight, the trial court explained, "I would have been hard pressed to come up with a different result. I probably would have bowed to the jury as an advisory body or so found and could articulate reasons to go that way."

**12.** So far as the record before us reveals, Georgetown made no motion for remittitur or for a new trial on the ground of excessiveness and may very well have waived its right to raise the issue for the first time on appeal.

The trial court proceeded to rule in the alternative: "If it's my judgment to make I couldn't have done it any better. And if it's the jury's judgment as a matter of law, which I think [it] should be in this circumstance, the jury has spoken and I don't touch the result. I find that Ms. Knight relied to her detriment forbearing other [employment] applications and that she is compensated accordingly."

Given this action by the trial court, which indicated that it would have reached the same conclusion as the jury did here,[11] we are quite satisfied that no remand is warranted. *See Hurwitz, supra,* 78 U.S.App. D.C. at 69, 136 F.2d at 799.

### B. Amount of Damages Awarded.

 Georgetown also argues that the award of $90,000 in damages was excessive because Ms. Knight was an at-will employee and therefore, even if she relied to her detriment on a promise of employment after the unit closed, she could not reasonably expect a steady stream of income from such employment.[12] We have held, however, that an employer's oral promise not to discharge an employee during a reorganization would be sufficient to rebut the presumption of at-will employment. *See Rinck v. Association of Reserve City Bankers,* 676 A.2d 12, 16 (D.C. 1996). The jury could find that Georgetown, through Dr. Sacher, made a promise of continued employment after the elimination of the Transfusion Services Unit, and that Ms. Knight remained with the unit until the very end in consideration of the promise. *See id.* at 17–18; *Nickens v. Labor Agency of Metro.*

> In our jurisprudential system, trial and appellate processes are synchronized in contemplation that review will normally be confined to matters appropriately submitted for determination in the court of first resort. Questions not properly raised and preserved during the proceedings under examination ... will normally be spurned on appeal.

*Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967) (footnotes omitted). However, since Ms. Knight poses no such objection to our consideration of the argument and since the outcome is clear-cut in any event, we address the merits of the argument.

*Wash.*, 600 A.2d 813, 817 (D.C.1991) (supervisor's promise that employee "would have a job as long as he [the supervisor] remained with the [employer]" was sufficient evidence to withstand summary judgment on at-will employment status). Although the promise stated no definite length of employment, at a minimum it assured a reasonable transition period for Ms. Knight to find a new job. As the trial court observed, the award of $90,000 was "short of any sinecure" and probably "intended to tide her over" until she could find comparable employment.

■■■ Nor do we think Georgetown has demonstrated that the specific amount awarded was excessive. "In this jurisdiction, a jury verdict is excessive when it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate, or when it is beyond all reason, or is so great as to shock the conscience." *Moss, supra,* 580 A.2d at 1035 (citations and internal quotation marks omitted). We cannot say that the award of $90,000 was excessive by this standard. After almost twenty-nine years of uninterrupted employment at Georgetown University Hospital, Ms. Knight had been earning $61,000 per year. Her expert economist estimated the present value of her economic damages, as measured by lost salary and retirement benefits, at up to $718,000. Even the defendants' expert estimated Ms. Knight's damages from lost salary and pension to be $523,000.

## V. Costs.

The trial court ordered the defendants collectively to pay one-fifth of Ms. Knight's court costs and ordered Ms. Knight to pay four-fifths of all the defendants' costs, reasoning that the defendants were the prevailing parties on four of the five claims in the complaint since Ms. Knight obtained a favorable verdict on only one of these claims, promissory estoppel. Ms. Knight's costs totalled $430.00, and one-fifth of that amount is

$86.00. The defendants' costs totalled $610.12, and four-fifths of that amount is $488.10. When the defendants' award was offset by Ms. Knight's, Ms. Knight owed the defendants the undivided sum of $402.10.

Ms. Knight challenges this allocation of costs. She asserts that because she prevailed on the promissory estoppel claim, none of the defendants can be deemed a "prevailing party" as that term is used in Superior Court Civil Rule 54(d) and thus none is entitled to costs.

■■■ Under Rule 54(d), "[e]xcept when express provision therefor is made either in an applicable statute or in these Rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the Court otherwise directs[.]" We review a trial court's decision regarding an award of costs under that rule for abuse of discretion. *See, e.g., Harris v. Sears Roebuck & Co.,* 695 A.2d 108, 109–10 (D.C.1997); *Talley v. Varma,* 689 A.2d 547, 555 (D.C.1997); *Ingber v. Ross,* 479 A.2d 1256, 1265 (D.C.1984). However, "litigants 'are entitled to have the trial judge exercise ... discretion unfettered by erroneous legal thinking.'" *Williams v. Vel Rey Props., Inc.,* 699 A.2d 416, 420 (D.C. 1997) (quoting *Wright v. United States,* 508 A.2d 915, 919 (D.C.1986)); *see also In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991).

■■■ Rule 54 costs may be awarded only to a prevailing party. *See, e .g., In re Antioch Univ.,* 482 A.2d 133, 138 (D.C.1984). In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court defined what is a "prevailing party." The plaintiff may be said to prevail if she "succeed[s] on any significant issue in litigation which achieves some of the benefit the part[y] sought in bringing suit." *Id.* at 433, 103 S.Ct. 1933 (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–79 (1st Cir.1978)); *accord, District of Columbia v. Patterson,* 667 A.2d 1338, 1345 (D.C.1995).[13] Even if a

---

13. These cases all were interpreting not Rule 54 but rather statutes authorizing the award of attorneys' fees in civil rights litigation as a part of costs. We do not think it useful in this particular appeal to explore at any length the question whether, and the degree to which, the definition of prevailing party and, more particularly, the range of trial court discretion may differ in the two situations. *See, e.g., Friends for All Children v. Lockheed Aircraft Corp.,* 233 U.S.App. D.C. 286, 292–93, 725 F.2d 1392, 1398–99 (1984) ("the broad statutory interpretation of 'prevailing

party prevails on only one out of several related claims, that party is deemed a "prevailing party" eligible for costs under Rule 54. *See Ross v. St. Augustine's College,* 103 F.3d 338, 344 (4th Cir.1996) (interpreting substantially identical Fed.R.Civ.P. 54); *Manildra Milling Corp. v. Ogilvie Mills, Inc.,* 76 F.3d 1178, 1183 (Fed.Cir.1996) (same); *see also* 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2667, at 212 (3d ed.1998). "Because a plaintiff prevails by achieving some of the benefit sought in bringing suit, it follows that a defendant is a prevailing party only if the plaintiff obtains no relief whatsoever from the litigation." 10 James Wm. Moore, Moore's Federal Practice § 54.171[3][c][iv], at 54–283 to –284 (3d ed.1998) (citation omitted).

■ Although Ms. Knight did not prevail under any of her claims under the DCHRA, in light of her success on the related promissory estoppel claim against Georgetown and the jury's award of $90,000 in her favor, we do not think that Georgetown could be deemed a prevailing party for purposes of receiving an affirmative award of costs in its favor, as resulted here.[14] In the particular circumstances here, the trial court misconceived its discretion under the rule in its mechanistic allocation requiring Ms. Knight to pay a portion of Georgetown's costs.

However, while Ms. Knight's partial but significant victory over Georgetown means that Georgetown cannot be deemed a prevailing party entitled to an affirmative cost award, that does not affect the status of the individual defendants, Dr. Sacher and Dr. Sandler. *Cf. Kleiman v. Aetna Cas. & Sur. Co.,* 581 A.2d 1263, 1267 (D.C.1990) ("Consolidation of two actions 'does not mean that they must be treated as one for the purpose

of awarding costs[.]' ") (citation omitted). As for those two defendants, the jury rendered verdicts in their favor on the DCHRA counts and Ms. Knight took nothing; they were not named as defendants on the count on which Ms. Knight prevailed. They were therefore prevailing parties entitled to an award of costs.

This case is complicated by the fact that all three defendants were represented by the same attorney, who incurred costs on behalf of all three and did not attempt to allocate those costs among them. On remand, if they wish to pursue this further, the parties may work with the trial court to find a fair method of apportioning costs among the three defendants to reflect each party's status as a "prevailing party" or otherwise.[15]

Accordingly, we vacate the award of costs and remand for a redetermination by the trial court. In all other respects, the judgment appealed from is

*Affirmed.*

---

party' recently established in civil rights type cases should not properly be applied in the ordinary tort case where Rule 54(d) is controlling"); *Sporicidin Co. v. Hauser,* 126 Daily Wash. L. Rptr.1905 (D.C.Super.Ct. July 2, 1998). We limit our holding to the precise facts of this appeal and do not address, for example, a situation where one or more counts were patently baseless.

**14.** Some cases have talked of parties prevailing on certain claims and not on others, in exercis-

ing discretion not to make any award of costs. *See Sporicidin Co. v. Hauser, supra* note 13, and federal cases cited therein. This is a different matter, however, from making an affirmative award of costs against a partially successful plaintiff.

**15.** We do not reach Ms. Knight's other arguments with respect to the allocation of costs because they may be obviated in the course of the redetermination of the award of costs.