Wandra McMANUS, Appellant,

v.

MCI COMMUNICATIONS CORPORATION, et al., Appellees.

Nos. 98–CV–1268, 98–CV–1504.

District of Columbia Court of Appeals.

Argued Nov. 3, 1999.

Decided April 13, 2000.

Robert L. Bell, with whom C. Vaughn Adams, Washington, DC, was on the brief, for appellant.

Harvey D. Rumeld, with whom Thomas F. O'Neil III, Washington, DC, was on the brief, for appellees.

Before STEADMAN and WASHINGTON, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

The questions presented in this employment discrimination case are: (1) whether the trial court erred in granting summary judgment to appellees MCI Communications Corporation, Jonelle Birney, and Terri Sallay on appellant's claims for discrimination based on race and personal appearance, in violation of the District of Columbia Human Rights Act (DCHRA), D.C.Code §§ 1–2501 to 1–2557 (1999 Repl.), and for wrongful discharge, interference with prospective advantage, and intentional infliction of emotional distress; and (2) whether the trial court erred in dismissing a second action, against MCI and another defendant, Bonnie Handy, filed by appellant while the summary judg-

ment motion was pending in the first case. We affirm both trial court orders.

## I.

The following facts, unless otherwise indicated, are undisputed. In 1986, MCI hired appellant Wandra McManus, an African–American woman, as a secretary. In May 1995, she became administrative assistant to appellee Jonelle Birney, a white woman, for several months after Birney had been named Vice President of the Public Relations (PR) Department. When Birney hired a permanent secretary, appellant was reassigned to the PR Department's Public Policy unit, managed at the time by Robert Stewart, a white male.

In June 1996, Birney approved appellant's request for a transfer to the newly created Business Operations Group as a budget coordinator, assigned to provide support to the PR Department. The PR Department continued to fund her position. In November 1996, appellee Bonnie Handy, Senior Manager of the Business Operations Group and a white woman, hired appellee Terri Sallay, an African–American woman, as Manager of Financial Operations. Sallay was assigned to provide financial and personnel support to the PR Department, and appellant was assigned to report to Sallay until appellant's employment was terminated in 1997. Another African–American woman hired at that time, Roslyn Blake, was assigned (among other duties) to provide support to other, smaller departments, similar to the support Sallay was giving the PR Department. Both Sallay and Blake had accounting degrees.

During the period that appellant had been a budget coordinator, her former supervisor, Birney, had used her as a backup secretary in the PR Department during the frequent absences of Birney's secretary, Ruth Modlin. Appellant complained about this to Sallay, who conveyed the complaint to Birney. According to appellant, her situation improved somewhat after that, although she continued to be pulled away from her work "every once in a while."

As evidence of discriminatory animus, appellant also cites an occasion on which an employee of Birney asked appellant, through another employee, to "fetch" some cookies for a meeting. Additionally, in October 1995—twenty months before the decision to terminate appellant's employment—while appellant was working in the PR Department's Public Policy unit, her manager, Stewart, replaced his African–American secretary with a white woman and moved his new secretary from a desk "behind the filing cabinets" to appellant's desk outside Stewart's office, after moving appellant to a desk behind the cabinets.

Appellant often came to work in African-styled attire and wore her hair with dreadlocks, braids, twists, and cornrows. She based her claim of personal appearance discrimination on comments—at unspecified times—by Stewart, Birney, and Frank Walter, a manager with no authority over her. More specifically, Stewart remarked about appellant's appearance: "That is a pretty outfit. Oh, my, your earrings are interesting. Oh, you have a new hair style, I like your hair." Birney told appellant at least once that she liked appellant's clothing and hair: "I like the way you wear your hair up, because it makes your facial features look better." "Oh, what kind of hair style is this, how did they do this?" "You look like an African princess." Walter told appellant that her African styled dress would make nice pillows for a room in his house with African artifacts and pictures; and on another occasion he noted that she was starting a "trend" around the office of African–American women wearing their hair in African styles.

In June 1997, Handy and Sallay decided to eliminate appellant's position and replace it with a higher level job because, they said, Sallay had become overburdened; she was unable to delegate some of the more complex finance tasks to appel-

lant. Handy and Sallay discussed the proposed termination with Maryann Adams and Eileen O'Brien of the Human Resources Department, and also met with Jonelle Birney to let her know of their intended action. On August 15, 1997, Handy and Sallay met with appellant to notify her that her employment was to be terminated. Appellant testified at her deposition that Sallay had told her that her job was being eliminated because the department was being realigned. They told her, she further testified, that she was eligible for rehire, that she could use the company's electronic bulletin board to search for other opportunities, and that she could contact Adams and O'Brien if she had questions or needed assistance in looking for another position. Later that evening, Sallay called appellant at home. Appellant says, and Sallay disputes, that in the course of that telephone conversation Sallay told her that Birney had been responsible for her termination.

At about the time of appellant's job termination, Birney's secretary, Modlin, a white woman, also was let go, and another white woman, Lugene Nigh, was dismissed from the Public Policy Group and offered a lower level position in the same group.[1]

In August 1997, within a week after appellant's dismissal, MCI advertised a vacancy for a "Budget Coordinator / Staff Admin IV"; appellant's most recent position had been "Budget Coordinator / Staff Admin III." MCI's announcement stated a preference for an accounting or finance degree and included some duties that ap-

pellant had not been performing.[2] Appellant proffers that she applied for this position, and MCI replies that it has no record of any such application but that appellant would not have been considered for the position because she lacked the necessary qualifications. After appellant filed suit against MCI, the job was re-posted with the added requirement of a bachelor's degree in finance or accounting; appellant did not have a college degree. MCI had not budgeted funding for this position,[3] although Sallay said MCI would have found the money if the position had been filled.

In September 1997, the newly created position was offered to Trina Sebron, an African–American woman with a bachelor's degree in finance, who turned it down. In October 1997, MCI hired Crystal Washington, also African–American with a college degree in finance, as a temporary employee to perform the duties associated with the position; when she left after four months MCI hired an Hispanic woman, Regla Perez Pino, as a temporary employee. Perez had been classified as a "Vendor Specialist," a position which does not require a college degree. In January 1998, the Budget Coordinator posting was further revised, and in March 1998 the position was offered to Angela Fifer, an African–American woman with a degree in accounting, who turned it down.

## II.

In granting summary judgment, the trial court ruled: "plaintiff has failed to es-

---

1. Appellees cite a third termination that occurred in the same time period, that of Alan Garrett, a white male. Appellant disputes the relevance of Garrett's situation, because he was a manager in another part of the corporation. She also disputes that Modlin was fired, asserting that Modlin had been allowed to retire.

2. Appellant described her duties as including processing check requests, tracking purchase orders, doing monthly accruals, reviewing variance reports, and updating the expense database; she further testified at deposition that she had a little experience with journal ledger entries, and that she had never per-

formed variance analysis and did not work on annual operating budgets or capital budgets. The job posted on August 18 included processing invoices, updating the expense database, reviewing variance reports, assisting in the preparation of the annual operating and capital budgets, and preparing journal entries.

3. In her brief, appellant cites this fact as evidence that MCI did not intend to fill the new position and that MCI accordingly had advertised it solely to provide a pretext for her termination.

tablish a prima facie case of race discrimination—her position was offered to two other African–American women before it was eliminated. Nor is there a prima facie case made out of personal appearance discrimination. Stewart & Walter played no part in her dismissal[,] and Birney's comments were complimentary and do not show any discriminatory animus. Beyond that MCI has shown that the reasons for plaintiff's dismissal were not pretextual. The remaining counts of subterfuge, wrongful discharge, interference with prospective advantage, and intentional infliction of emotional distress are frivolous for the reasons noted" in defendants' motion.

### III.

 We agree with the trial court that appellant failed to make out a *prima facie* case of race or personal appearance discrimination.[4] In order to survive appellees' summary judgment motion, appellant was required to show, with respect to each contention, that "(1) she belongs to a protected class; (2) that she was qualified for the job from which she was terminated; (3) that her termination occurred despite her employment qualifications; (4) and that her termination was based on the characteristic that placed her in the protected class." *Blackman v. Visiting Nurses Ass'n,* 694 A.2d 865, 868–69 (D.C.

1997) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under the fourth criterion, moreover, she was required to show that race or personal appearance was a substantial factor in the termination decision by demonstrating that: "(1) she was replaced by a person outside of her protected class, or if the position has remained vacant, that the employer has continued to solicit applications for the position; or (2) that other similarly situated employees ... were not terminated but were instead treated more favorably." *Id.* at 871, 93 S.Ct. 1817 (citing *O'Donnell v. Associated Gen. Contractors of America, Inc.,* 645 A.2d 1084, 1087 (D.C.1994)). The requirement of a showing that similarly situated employees were treated more favorably is imposed when a plaintiff has not alleged that someone replaced her when she was terminated. *O'Donnell, supra,* 645 A.2d at 1088.

### A.

 As to her claim of racial discrimination, appellant contends that she belongs to a protected class, that she was qualified for the job she held, that she was fired nonetheless, that her position itself never had been eliminated, and that a person of a different race had filled it.[5] If this were

---

**4.** Appellant's complaint also included a claim for "subterfuge" under the DCHRA. The DCHRA's subterfuge provision makes it unlawful to "do any of the [prohibited] acts for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason...." D.C.Code § 1–2512(b) (1999 Repl.). Because this provision presupposes a discriminatory act which is alleged to have been committed by subterfuge, appellant's claim under this heading necessarily fails upon the judgment against her on her claims for race and personal appearance discrimination.

**5.** Solely for purposes of reviewing on summary judgment the legality of appellant's job termination, we accept her contention that she was fired and replaced, rather than reaching appellees' contention that her job had been eliminated. Appellees argue, to the con-

trary, that appellant's position had been eliminated and a new one created. If we were to conclude that the record unambiguously supported this contention, then appellant's required *prima facie* showing would be different; however, she still would be required to show circumstances giving rise to an inference of discrimination. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In making a *prima facie* case of employment discrimination in the absence of an allegation that someone had replaced her in the same job, appellant would be required to show that the jobs of one or more persons who were not members of the protected class, and who had jobs similar to hers, had not been terminated. *Cf. O'Donnell, supra,* 645 A.2d at 1088. MCI identified three white employees who had been let go at the same time appellant was dismissed. Appellant argues, however, that

true, all elements of a *prima facie* case, including the "substantial factor" requirement of the fourth criterion, would have been satisfied. Appellant's argument, however, is premised on MCI's hiring of Regla Perez, the second temporary employee engaged to perform appellant's duties after her termination.[6] But the first person hired to perform appellant's duties was Crystal Washington, an African–American woman. Although Ms. Washington left MCI after several months, there is no proffered evidence that she had not been qualified for the job, that her leaving MCI had not been voluntary, or that her hiring had been a subterfuge to create, temporarily, an appearance of a nondiscriminatory African–American successor before replacing appellant with an employee outside her protected class. The record thus provides no basis for passing over Ms. Washington and identifying Ms. Perez as appellant's successor. Because appellant accordingly did not show that MCI replaced her with someone outside her protected class, she failed to establish a *prima facie* case of race discrimination.

**B.**

◼ Appellant also did not present a *prima facie* case of discrimination based on personal appearance. None of the statements made about her personal appearance was attributable to either of the two supervisors, Handy or Sallay, who made the decision to let appellant go and notified her of that decision. Among those alleged to have made statements about appellant's personal appearance—Stewart, Walter, and Birney—only Birney is alleged to have been involved in the termination decision. But Birney's comments about appellant's appearance were facially complimentary (as were Stewart's and Walter's, for that matter) and thus do not give rise to a reasonable inference of discrimination unless proffered with evidence tending to show that, in reality, the apparent compliments actually were snidely made, implying discriminatory animus.

◼ We turn to the case law to put appellant's proffered evidence of discrimination in the appropriate legal context. Decisions interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1994), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* (1994), have required that, for evidence of discrimination, there must be a nexus between the alleged discriminatory statement and the challenged termination decision.[7] "Evidence

---

the circumstances surrounding the termination of two of those employees make it inappropriate to consider them in conjunction with her own job termination. Even so, it is undisputed that the third employee, Lugene Nigh, a white female, had been let go at the same time appellant departed. Although Nigh had been offered another position in her group at MCI, it also is not disputed that her managers knew she would not accept the proffered position. Nigh's employment with MCI thus ended when her position was terminated, and appellant accordingly cannot show that a similarly situated MCI employee, not a member of her protected class, was not terminated. In any event, we think the wiser course is to disregard appellees' contentions in assessing appellant's *prima facie* case. Cf. *MacDonald v. Eastern Wyo. Mental Health Ctr.,* 941 F.2d 1115, 1119–21 (10th Cir.1991) (placing issue of employee's qualification for position at pretext stage of inquiry by treating employer's contention that employee was

"not qualified" as articulation of legitimate nondiscriminatory reason rather than as negation of an essential element of employee's *prima facie* case).

**6.** Appellant has singled out MCI's hiring of Perez as evidence of discrimination notwithstanding the fact that she was a temporary employee whom MCI did not identify as a permanent replacement for appellant. Appellant's argument appears to be premised on the fact that Perez remained in the temporary position throughout the period of discovery in the case.

**7.** This court often has looked to cases interpreting Title VII to aid in construing the D.C. Human Rights Act. *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n. 17 (D.C. 1993). We also have recognized that DCHRA is analogous to the ADEA in some important respects. *East v. Graphic Arts Indus. Trust,* 718 A.2d 153 (D.C.1998).

of a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to sustain a claim under Title VII." *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir.1993) (internal citations omitted). Indeed, "such remarks, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements were uttered by a decision maker." *Id.* Under the ADEA, as well, federal courts generally have held that isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions and do not survive motions for summary judgment or judgment notwithstanding the verdict. *See, e.g., Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir.1993) (no *prima facie* case where plaintiff's supervisor previously had made statement to plaintiff that "[w]e don't necessarily like grey hair," since comment was uttered in ambivalent manner and was not tied directly to plaintiff's job termination); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir.1994) ("[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions" where CEO previously had made statement that hospital "needs some new young blood" and that "long-term employees have a diminishing return"); *Waggoner v. City of Garland*, 987 F.2d 1160, 1166 (5th Cir.1993) (where plaintiff's supervisor had commented that plaintiff was an "old fart," the court stated: "As we have held on several occasions, a mere 'stray remark' is insufficient to establish age discrimination."); *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir.), *cert. denied*, 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993) (statement made by plaintiff's supervisor about plaintiff's birthday one year before her job termination was too ambiguous to establish necessary inference of age discrimination, and was made too long before layoff to have influenced termination decision).[8]

In contrast, these same courts have held that summary judgment was not appropriate where the plaintiff established a sufficient nexus between the alleged remark and the challenged termination decision. *See, e.g., Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir.1996) (sufficient nexus where supervisor's recommendation to terminate plaintiff "was clearly before the decision maker" at time supervisor made statements); *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 683 (9th Cir.1997) (age-related comments made by plaintiff's supervisor in months before plaintiff's termination, and associated with attempts to transfer plaintiff to another position, were not merely "stray remarks"); *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 254 (5th Cir.1996) (rejecting employer's argument that statement by trustee of hospital that "[t]hey're gonna lay off those old people," made two weeks before reduction in force, was "vague" or "remote in time" and therefore "merely a stray remark").

In this case, there is no evidence linking the alleged statements about appellant's appearance to the decision to terminate appellant's job. Indeed, there is no evidence indicating when the comments were made, and there is no evidence that they were made in the context of the decision-making process. At most, the record confirms that the comments were "stray remarks" that do not reflect discriminatory animus in the decision to dismiss appellant from her job. Because no other facts were presented to support appellant's claim for personal appearance discrimination, the trial court did not err in granting summary judgment.

Appellant suggests, nonetheless, that because she was an African–American who

---

**8.** In *Cone, Waggoner,* and *Phelps,* the court assumed the existence of a *prima facie* case and held that the alleged discriminatory statements did not satisfy the plaintiff's burden of persuasion.

displayed her heritage through her clothing and hairstyle, appellees discriminated against her based on the combination of her race and personal appearance. More specifically, we understand appellant to be arguing that, because of her choice of clothing and hairstyle, she represents a subset of African–Americans whose claim of discrimination based on race, coupled with personal appearance, cannot be defeated by hiring to replace her an African–American whose dress more typically reflects corporate America. While there may be circumstances in which such a claim of discrimination would be legally cognizable, appellant has not proffered facts sufficient to support such a claim here; there is no demonstrable nexus on this record between the comments allegedly made about her personal appearance and the decision to terminate her employment.

Let us assume, nonetheless, that a jury reasonably could infer that the ostensibly benign comments by Birney, Walters, and Stewart about appellant's appearance actually were snide, when viewed in conjunction with the decision to move appellant's desk to a less visible location, and with the eventual decision to terminate appellant's employment. Even so, any inference of discrimination based on this sequence of events—occurring as it did over a two-year period—would be too attenuated for a reasonable inference of discharge based on personal appearance discrimination. Not enough is proffered, with essential specificity, for this court to conclude that MCI would have had to replace appellant with a candidate who shared her pro-African sense of style in order to rebut a reasonable inference of discrimination. Because appellant has provided no other basis for an inference that MCI's replacement of her with an employee who dressed differently was indicative of discriminatory animus, we must reject this contention.

## IV.

The trial court properly dismissed appellant's claim for wrongful discharge. It is undisputed that she was an "at will" employee. This court already has rejected the argument appellant now makes under *Carl v. Children's Hosp.*[9] that a public policy exception to the at-will doctrine applies to an alleged statutory violation. *See Freas v. Archer Servs., Inc.*, 716 A.2d 998, 1002 (D.C.1998) ("there is no need to apply the *Carl* rationale because the legislative policy [in the statute allegedly violated] is explicit and may apply directly to [appellee's] alleged discharge of [appellant]"). Having previously concluded that MCI did not violate appellant's rights under the DCHRA, there is no room to make the argument again under *Carl*.

## V.

■ This court has described "prospective advantage," in defining the tort of interference with prospective advantage, as "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate, [and] are considered to be property." *Carr v. Brown*, 395 A.2d 79 (D.C.1978). It is clear that, as an at-will employee, appellant did not have a contractual employment relationship she could use as the basis for a suit for tortuous interference with a contractual relationship. *See Bible Way Church v. Beards*, 680 A.2d 419, 432–33 (D.C.1996). Appellant argues, nonetheless, that this claim is available because she had a long-term employment relationship and an expectancy of continuing employment relations with MCI.

■ This court never has held that an employee can maintain a suit for interference with prospective advantage where her expectancy was based on an at-will relationship, and we do not do so now. However, even were we to afford appellant contractual protections based on her al-

---

9. *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C. 1997) *(en banc )* (holding that court may recognize additional public policy exceptions to at-will doctrine).

leged expectancy (which we are not willing to do), appellant still could not survive summary judgment on this record. She could not proceed against MCI because it is axiomatic that an employer cannot interfere with its own contract. *See Sorrells v. Garfinckel's, et al.,* 565 A.2d 285, 290 (D.C. 1989) (citing *Press v. Howard Univ.,* 540 A.2d 733, 736 (D.C.1988)). As to Sallay and Birney, "the law affords to a supervisor . . . a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers—those who have the power to hire and fire." *Id.* at 291. "The defendant's employees acting within the scope of their employment are identified with the defendant . . . so that they may ordinarily advise the defendant to breach his [or her] own contract without themselves incurring liability in tort." *Id.* (citing W. KEETON, PROSSER & KEETON ON THE LAW OF TORTS § 129, at 990 (5th Ed.1984)). Appellant could survive a summary judgment motion on her claims against Sallay and Birney (if available) only if she produced facts that suggest that they "procure[d] a discharge of the plaintiff for an improper or illegal purpose." *See id.* (citing KEETON, *supra,* at 990 n. 25 (citations omitted)). As discussed above in the context of appellant's discrimination claims, she has not made such a *prima facie* case.

## VI.

■ To prevail on a claim for intentional infliction of emotional distress, appellant was required to prove that appellees engaged in extreme or outrageous conduct which intentionally or recklessly caused her severe emotional distress. *See Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 627 (D.C.1997). Appellant has alleged that appellees acted maliciously toward her and that she suffered severe emotional distress as a result. She contends that racist conduct is clearly extreme and outrageous, and that the comments made about her appearance offended her personal dignity and were offensive to her heritage as an African–American woman.

■ The actions of MCI and the individual defendants do not rise to the level required to proceed with a claim for intentional infliction of emotional distress. Liability is imposed only for conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998) (internal citations omitted). This court has refused to impose liability for conduct even more outrageous than that alleged by appellant. *See, e.g., Kerrigan, supra,* 705 A.2d at 627 (employer allegedly manufactured evidence to establish a claim of sexual harassment against plaintiff and then demoted him and leaked information to other employees); *see also Waldon v. Covington,* 415 A.2d 1070 (D.C.1980) (employers' actions taken with aim to embarrass and then terminate plaintiff's employment). Moreover, appellant's argument that public policy concerns dictate resolution of this claim in her favor are unavailing; *see, e.g., Adams v. George W. Cochran & Co.,* 597 A.2d 28 (D.C.1991) (discharge of employee who refused to disobey law by driving unsafe truck was not extreme and outrageous).

## VII.

Appellant filed a second action against MCI (McManus II) while appellees' summary judgment motion in appellant's original complaint (McManus I) was pending. The second complaint almost was identical to the one in McManus I, with a few differences. First, the individual defendant was different: the second suit named Bonnie Handy in place of Birney and Sallay. Second, McManus II alleged additional facts regarding MCI's failure to rehire appellant. The two cases asserted the same six legal claims, with the second complaint alleging an additional claim, for conspiracy. After the court entered summary judgment in McManus I, the trial court

dismissed McManus II, ruling that res judicata barred the claims against MCI and that collateral estoppel precluded the claims against Handy.

 Under the doctrine of res judicata, i.e., claim preclusion, "a final judgment on the merits ... precludes relitigation in a subsequent proceeding of all issues arising out of the same cause of action between the same parties or their privies, whether or not the issues were raised in the first proceeding." *Carr v. Rose,* 701 A.2d 1065, 1070 (D.C.1997). Thus, res judicata "prevent[s] the same parties from relitigation of not only those matters actually litigated but also those which might have been litigated in the first proceedings." *Stutsman v. Kaiser Found. Health Plan,* 546 A.2d 367, 369–70 (D.C. 1988) (citations and internal quotation marks omitted). "If there is a common nucleus of facts, then the actions arise out of the same cause of action." *Faulkner v. GEICO,* 618 A.2d 181, 183 (D.C.1992).

██ Although appellant contends that she did not know the facts out of which McManus II arose until late in discovery during McManus I, it is undisputed that Handy—the new individual defendant in McManus II—was present at appellant's job termination. In one of the earliest depositions, moreover, Sallay testified that Handy had "instigated" appellant's termination. As to the additional facts alleged relating to MCI's failure to rehire appellant, these were known to appellant during the pendency of McManus I, including MCI's hiring of Regla Perez as a vendor specialist.[10] The two cases accordingly arose out of the same common nucleus of facts; res judicata barred appellant from relitigating the action against MCI. *See Faulkner, supra,* 618 A.2d at 183.

██ Because Handy was not a party to the first suit, res judicata might not bar appellant's claims against her. *See District of Columbia Redevelopment Land Agency v. Dowdey,* 618 A.2d 153, 163–64 (D.C.1992). Appellees contend, however, that collateral estoppel, i.e., issue preclusion, bars the McManus II complaint against Handy—as the trial court held in dismissing appellant's claims against her. Collateral estoppel "restricts a party in certain circumstances from relitigating issues or facts actually litigated and necessarily decided in an earlier proceeding." *Ringgold v. D.C. Dept. of Employment Servs.,* 531 A.2d 241, 243 n. 3 (D.C.1987) (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979), and RESTATEMENT (SECOND) OF JUDGMENTS § 27). At issue in McManus I was the liability of MCI, Birney, and Sallay for their actions in terminating appellant's employment. The only issue left to be litigated in McManus II, therefore, was the liability, if any, for Handy's actions implicated in the termination of appellant's employment. This issue was not "actually litigated and necessarily decided," *id.,* in McManus I.

██ We conclude, however, that the McManus II complaint fails to allege facts sufficient to make out a *prima facie* case against appellee Handy. Most of the questions of fact that bear on appellant's claims against Handy in McManus II have been litigated in McManus I, and appellant is precluded from relitigating those facts that were necessary to the court's judgment against her in that proceeding. *See id.* In McManus II, appellant alleges only two facts specific to actions taken by Handy: that she had offered a position to

---

10. Although appellant raised, in McManus I, the circumstances of MCI's subsequent hiring practices as material to her claim of discrimination, she did not directly argue that MCI had an obligation to rehire her, and because she is estopped from raising that argument against MCI in McManus II, the trial court was correct in not reaching the merits of the argument as to that defendant. We note, however, that according to appellant's own testimony at deposition, Sallay offered appellant the use of the company's electronic bulletin board and personnel staff for help in looking for other opportunities within MCI. We are unable to discern any record basis for a ruling that MCI acted wrongfully as alleged.

Lugene Nigh that Handy had not offered to appellant, and that Handy had written a memorandum that provided justification for terminating appellant's employment. Neither of these facts, however, if proved, would advance appellant's claims for violations of the District of Columbia Human Rights Act, since they are not probative of appellant's assertion that she was replaced by a person outside her protected class; and Handy is not alleged to have made any comments about appellant's personal appearance. Nor do these facts advance appellant's claim for wrongful discharge or for interference with prospective advantage, in the absence of a contract of employment. Appellant's claim of intentional infliction of emotional distress also fails since, even with these additional facts, Handy's alleged conduct is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community," see Homan, supra, 711 A.2d at 818. Dismissal of appellant's claims against Handy, therefore, was correct.

Although McManus II includes claims for "failure to rehire or recall," appellant has not identified any basis for appellees' obligation to rehire or recall her, and we cannot divine any such ground that would not have arisen out of her other claims. Because appellant did not advance facts sufficient to sustain her other claims, her claim for "failure to rehire" also was appropriately dismissed.

*Affirmed.*