Barbara A. FUTRELL, Appellant,

v.

DEPARTMENT OF LABOR FEDERAL CREDIT UNION, et al, Appellees.

No. 01–CV–499.

District of Columbia Court of Appeals.

Argued April 9, 2002.
Decided Feb. 6, 2003.

---

1. There was no allegation of misappropriation.

794

C. Hope Brown for appellant.

F. Joseph Nealon, with whom Kirsten E. Keating, Washington, DC, was on the brief, for appellees.

Before STEADMAN, RUIZ and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellant, Barbara A. Futrell, appeals from the grant of summary judgment in favor of appellees, her former employer, the Department of Labor Federal Credit Union (DOLFCU or "credit union"); Robert Kravetz, the President of its Board of Directors ("Board"); and CUNA Mutual Group, the parent company of DOLFCU's bonding company, CUMIS Insurance Society ("CUMIS"). Futrell brought suit against DOLFCU and Kravetz for race and age discrimination under the District of Columbia Human Rights Act (DCHRA), D.C.Code § 1–2501 *et seq.* (1999 Repl.) (now codified at D.C.Code § 2–1401.01 *et seq.* (2001)), as well as for wrongful discharge arising out of her demotion and her subsequent termination. In addition, she brought a claim for tortious interference with employment rights against Kravetz and CUMIS, and an intentional infliction of emotional distress claim against all appellees. Futrell also challenges the trial

court's ruling denying her motion to compel the production of collective bargaining agreements and the trial court's failure to rule as to the production of complete National Credit Union Administration (NCUA) reports concerning the credit union's performance. Finding no merit to her claims, we affirm.

### I.

Appellant Futrell, an African American woman who was 58 years old at the time of her termination, was employed by DOLFCU for over 38 years, from March 1, 1961 to December 6, 1999. In 1961, she was hired as a part-time employee, she subsequently became a full-time teller in March of 1962, and was then promoted to Head Teller. She was later promoted to the position of loan processor in the Loan Department and, in 1995 Futrell was made DOLFU's Acting Assistant Manager. In July 1997, Futrell was promoted to Acting Manager and in July 1998, the Board voted unanimously to appoint her as the Manager of DOLFU. At the July 15, 1998 Executive Session Meeting where this decision was made, Bonnye Newkirk, the Board's Treasurer, characterized Futrell as "the best candidate" among the four interviewed for the position because "she has worked well under difficult circumstances and ... the Board needs a hands-on person immediately."

On May 3, 1999, Futrell received an official performance evaluation from DOLFCU, which referred to the 1998 and 1999 National Credit Union Administration ("NCUA")[1] examination reports. Although the performance evaluation period was for July 1998 through July 1999, she was evaluated in May 1999. The evaluation noted deficiencies in Futrell's perfor-

---

1. NCUA is an independent federal agency that regulates and insures federal credit unions such as DOLFCU.

mance in several areas, including "Organizational Development & Administration,"[2] "Financial Management,"[3] "Communication/Public Relations,"[4] "Human Resource Management,"[5] and "Planning."[6] The evaluation concluded by describing Futrell as a person who "is willing to do her best but has not performed the duties of Manager at an acceptable level."

2. Under "Organizational Development & Administration," the evaluation indicated the following concerning Futrell's performance: "there is no indication that the financial condition of the credit union or critical issues uncovered by the NCUA examiner are understood by the manager;" "[p]er NCUA examiner's draft report, the manager does not act as liaison but continually defers to other staff to perform liaison activities;" "on occasion, the manager has incorrectly interpreted some of [Board approved policies] or failed to request clarification if they were not understood;" "[n]umerous deficiencies and recommendations with regard to internal controls have been noted for a significant span of time and have not been corrected by the manager;" "[t]he manager has failed to satisfactorily demonstrate the ability to identify, analyze and solve functional and operational business problems;" "[i]n view of the many problems identified in the 1998 and 1999 NCUA examination reports, it is clear that the manager has failed to demonstrate an ability to find alternative solutions to work-related problems and use resources creatively to solve problems;" "[t]he manager ... has not ensured that the basic record keeping requirements of the credit union are maintained;" and "[i]n view of the many record keeping deficiencies that persist, it is doubtful that the manager reviews the operating results or uses them as a measure of the credit union's performance."

3. With respect to "Financial Management," the evaluation indicated that during her tenure as Manager, Futrell "had not made any recommendations regarding investments nor the investment policy nor did she contribute to the development or revision of the policy adopted by the Board during the rating period;" "she delegated the responsibility for developing the 1999 budget to her assistant manager and provided little or no input;" and she "has not demonstrated an ability to apply financial principles and techniques to address

On June 10, 1999, during an Executive Session of DOLFCU's Board of Directors' meeting, a majority of the Board members entered a vote of "no confidence" in Futrell's ability to manage the credit union.[7] In a July 8, 1999 letter on behalf of the Board, Kravetz demanded Futrell's resignation as Manager by July 22, 1999 to be effective August 27, 1999, and presented

the serious issues facing the credit union such as serious declines in lending and substantial charge-offs and delinquencies."

4. The "Communication/Public Relations" section of the evaluation indicated that "[m]uch of the communication with and operational direction to staff has been delegated to assistant manager;" "the manager has not met satisfactorily her duty to build and/or maintain the credit union's credibility as a high quality financial institution" by being responsive to customers; "[i]n the face of a loss in earnings, decline in lending, and rise in delinquencies, the manager has not articulated a plan to rebuild the credit union as a high quality financial institution;" and "[t]he manager has failed to maintain an active and effective marketing plan and program."

5. With respect to "Human Resource Management," the evaluation indicated that "[t]he manager has failed to satisfactorily develop and oversee standards for training, hiring and supervising staff," and that "[i]t appears that the manager has delegated all responsibility for hiring and supervising to the assistant manager."

6. Under "Planning," the evaluation indicated that "[t]he manager has not articulated or presented clear goals and new strategies to address the serious declines in lending and earnings or to anticipate changes in the financial market."

7. Kravetz's initial motion called for serving a termination notice on Futrell. A substitute motion was then presented, which provided that Futrell receive a vote of "no confidence" from the Board, a request for her resignation by July 31, 1999, and indicated that the Board would be receptive to her proposal for a severance package. Kravetz was among those who voted in favor of the substitute motion.

her with two alternatives-severance pay in the amount of $40,329 or reassignment to the position of Assistant Manager for Special Projects at an annual salary of $58,027. The letter also indicated that she was being presented with these two options because the DOLFCU Board recognized her "prior contributions and many years of service to the Credit Union." On August 19, 1999, Kravetz withdrew the July 8, 1999 letter, and instead demoted and reassigned Futrell to the position of Assistant Manager for Special Projects at a $68,570 annual salary effective September 12, 1999. An older white male, Leonard Supchak, was hired to serve as Acting Manager until a permanent Manager was hired. On December 13, 1999, a younger white female was hired as Manager. During her June 8, 2000 deposition, Futrell conceded that she was unable to perform the duties of the Manager position at an acceptable level.[8]

On May 6, 1999, at a meeting attended by Futrell, the DOLFCU Board adopted a new travel and expense policy for officials and employees of the credit union. The policy prohibited the use of the corporate credit card for personal purchases: "[t]he corporate card is not to be used for any personal purchases by anyone. If it is used for personal purchase [sic] then possession of the card will be revoked ... (Purchase as described above includes both intentional and accidental usage)." In September 1999, DOLFCU learned that Futrell used the corporate credit card for personal purchases on several occasions in violation of the travel and expense policy. These credit card charges, which were incurred between June 27, 1999 and September 11, 1999, were neither supported by the required documentation nor did they appear to be business-related. In a memorandum dated October 18, 1999, Kravetz requested that Futrell provide the Board with an explanation by October 21, 1999 as to the nature of each of the fourteen charges and whether they were business-related. In that memorandum, Kravetz noted that Futrell had already admitted to making several other personal credit card charges, but had not made restitution to DOLFCU for all such charges. Futrell did not provide documentation, but in a letter dated October 21, 1999, her attorney informed DOLFCU that the credit card charges that were not business-related "occurred as a result of an excusable error caused in part by the DOLFCU VISA coordinator," and that such charges had been reimbursed.

In order to protect itself from any losses due to fraud or theft, DOLFCU maintains a bond coverage provided by CUMIS, for its employees. The terms of DOLFCU's bonding by CUMIS are governed by the "CUMIS Credit Union Bond 400 and Special Insurance Package of Protection." The "Coverages" section of that policy provides that "CUMIS will pay you for your loss resulting directly from dishonest acts committed by an 'employee' or 'director,' acting alone or in collusion with others." Under "Conditions," the CUMIS Credit Union Bond provides that:

1. This Bond's coverage for an "employee" or "director" terminates immediately when one of your "directors," officers or supervisory staff not in collusion with such person learns of:

---

**8.** Futrell's deposition testimony regarding her performance as Manager was as follows:
[By defense counsel]
Q. ... Isn't it true you're a person of personal character who tried to do your best but simply couldn't perform the duties of manager at an acceptable level?
A. Yes.

a. Any dishonest or fraudulent act committed by such "employee" or "director" at any time, whether or not related to your activities or of the type covered under this Bond ...

2. CUMIS at its sole option may terminate coverage for an "employee" or "director." Such termination will be effective 15 days after receipt by you ... of written notice of such termination from CUMIS.

3. Termination of coverage for an "employee" or "director" under paragraphs 1. or 2. above terminates CUMIS's liability for any loss resulting from any act or omission by that "employee" or "director" occurring after the effective date of such termination.

In an October 28, 1999 fax, Supchak, the acting Manager, notified CUMIS of Futrell's possible violation of the travel and expense policy by filing a "CUMIS Bondability Notice of Employee Discrepancies." In that form, in response to a question entitled "Detailed description of the activity," Supchak indicated that "Barbara A. Futrell was using the DOLFCU Corporate Visa Credit Card to purchase personal items. She only made restitution after we reviewed the statements [and] found that these items were not purchased for the credit union." In an additional "Note" at the end of the form, Supchak wrote, "[w]e feel you should be put on notice ... in the event we have future claims. We also need in writing from you that she will continued [sic] to be bonded." On October 29, 1999, Wayne Scholze, a CUMIS representative, informed Futrell by letter that such unauthorized use of the corporate credit card would result in the termination

of her bond since such activity "places the credit union and CUMIS in a position of increased risk." CUMIS indicated that it would allow her 15 days to provide a detailed written response and supporting documents before terminating her bond coverage on December 6, 1999.

In a November 22, 1999 letter, Futrell's counsel responded to CUMIS's October 29, 1999 letter, explaining that the personal charges "occurred as a result of an error caused in part by the DOLFCU Visa coordinator," and that the charges had been reimbursed to DOLFCU. In a letter dated November 30, 1999, the CUMIS representative notified Futrell that her bond coverage would terminate effective December 6, 1999 because he believed that the personal charges were Futrell's responsibility, not that of the Visa coordinator. As a result of the termination of her bond coverage, Kravetz terminated Futrell on the same day, basing his decision on the fact that federal regulations require that federal credit unions only employ persons who are bonded pursuant to 12 C.F.R. §§ 713.1, 713.3 (2002).[9] On December 10, 1999, the Board voted to ratify her termination.

## II.

### A. Summary Judgment Standard

 On appeal, we review the grant of a motion for summary judgment *de novo*, relying on the same standard that was used by the trial court. *Hollins v. Fedreal Nat. Mortg. Ass'n*, 760 A.2d 563, 570 (2000). Thus, we must conduct an independent review of the record, assessing it in the light most favorable to the

9. 12 C.F.R. § 713.1 indicates that "[t]his section provides the requirements for fidelity bonds for Federal credit union employees and officials." 12 C.F.R. § 713.3 provides that "[a]t a minimum, your bond coverage must: (a) [b]e purchased in an individual policy from a company holding a certificate of authority from the Secretary of the Treasury," and (b) "[i]nclude fidelity bonds that cover fraud and dishonesty by all employees, directors, officers, supervisory committee members, and credit committee members."

nonmoving party and "resolving against the moving party any doubts about the existence of a material factual dispute." *Id.*[10] In order to prevail on a motion for summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super. Ct. Civ. R. 56(c); *Hollins, supra,* 760 A.2d at 570. Once this burden has been met, "the nonmoving party has the burden of producing evidence that shows there is sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C.1999) (citations and internal quotation marks omitted); *accord, Hollins, supra,* 760 A.2d at 570. In the event that the nonmoving party fails "to counter[ ] the allegations of the moving party with specific facts, the motion for summary judgment will be granted." *Paul v. Howard Univ.,* 754 A.2d 297, 305 (D.C.2000).[11]

**B. Race and Age Discrimination Claims Under the DCHRA**

■ The DCHRA provides in pertinent part that

(a) *General.*—It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race ... [or] age ... of any individual:

> (1) *By an employer.*—To ... discharge, any individual; or otherwise discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment ... or to limit, segregate or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.

D.C.Code § 1–2512(a) (1999 Repl.) (now codified at D.C.Code § 2–1402.11(a) (2001)); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993). In considering claims brought under the DCHRA, we rely on "the same three-part, burden-shifting test articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Hollins, supra,* 760 A.2d at 571; *accord, Blount, supra* note 13, 775 A.2d at 1115; *McManus v. MCI Communications, Corp.,* 748 A.2d 949, 956 n. 7 (D.C.2000), *cert. denied,* 531 U.S. 1183, 121

---

**10.** In doing so, however as in the trial court the scope of our review is "defined by the context of the legal and factual issues as framed by the parties." *Dorsky Hodgson & Partners, Inc. v. National Council of Senior Citizens,* 766 A.2d 54, 54, 58 (D.C.2001) (citation omitted). Likewise, a party is bound by the factual disputes raised before the trial court and cannot raise new factual disputes for the first time on appeal. *Urban Masonry Corp. v. N & N Contractors, Inc.,* 676 A.2d 26, 32 n. 12 (D.C.1996).

**11.** We have recognized that summary judgment "should be sparingly granted in cases involving motive or intent," and that "[c]ourts are justifiably hesitant to throw out employment discrimination cases on summary judg-

ment, since they almost always involve issues concerning the employer's (or supervisor's) motive or intent." *Hollins, supra,* 760 A.2d at 570–71; *see also Blount v. Nat'l Ctr. for Tobacco–Free Kids,* 775 A.2d 1110, 1114–15 (D.C.2001) ("It is especially in civil rights disputes that we ought to be chary of disposing of [cases] on the pleadings, for courts do in fact have a predilection for allowing civil rights cases to proceed until a comprehensive record is available to either support or negate the facts alleged") (citations and internal quotations marks omitted). However, we have also recognized that there are cases demanding such treatment because the appellant failed to offer evidence of either disparate treatment or discrimination. *Hollins, supra,* 760 A.2d at 571.

S.Ct. 1167, 148 L.Ed.2d 1026 (2001); *Knight v. Georgetown Univ.*, 725 A.2d 472, 478 n. 5 (D.C.1999).

■■■■ In order to survive a motion for summary judgment on her age and race discrimination claims, Futrell must

make a prima facie showing of discrimination by a preponderance of the evidence. The prima facie showing, when made, raises a rebuttable presumption that the employer's conduct amounted to unlawful discrimination. Once the presumption is raised, the burden shifts to the employer to rebut it by articulating "some legitimate, nondiscriminatory reasons for the employment action." ... Finally, "the burden shifts back to the employee to prove, again by a preponderance of the evidence, that the employer's stated justification for its action 'was not its true reason but was in fact merely a pretext' to disguise discriminatory practice."

*Hollins, supra*, 760 A.2d at 571 (citations omitted); *Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868 (D.C.1997); *Arthur Young, supra*, 631 A.2d at 361; *Knight, supra*, 725 A.2d at 478. "Although the burden of production may shift from the employee to the employer and back to the employee, the employee retains the ultimate burden of persuading the finder-of-fact that the employer acted with discriminatory animus." *Blackman, supra*, 694 A.2d at 868; *accord, Hollins, supra*, 760 A.2d at 571; *Knight, supra*, 725 A.2d at 478. Moreover, "conclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment." *Hollins, supra*, 760 A.2d at 570; *O'Donnell v. Associated Gen. Contractors of Am.*, 645 A.2d 1084, 1086 (D.C.1994).

### 1. Prima Facie Case

■■■■ Establishing a prima facie case of age and race discrimination requires that Futrell make a showing "(1) [that] she belongs to a protected class; (2) that she was qualified for the job[s] from which she was [demoted and] terminated; (3) that her [demotion and] termination occurred despite her employment qualifications; and (4) that her [demotion and] termination was based on the characteristic that placed her in the protected class." *McManus, supra*, 748 A.2d at 954; *accord, Hollins, supra*, 760 A.2d at 572; *Blackman, supra*, 694 A.2d at 868–69; *Arthur Young, supra*, 631 A.2d at 361. In this case, the trial court found—and appellee does not challenge—that Futrell had met her burden of establishing a prima facie case of age and race discrimination. Therefore, we must determine whether the trial court erred in finding that DOLFCU articulated legitimate nondiscriminatory reasons for her demotion and firing and that Futrell failed to prove by a preponderance of the evidence that the reasons articulated by DOLFCU and Kravetz were a pretext for discrimination.

### 2. Legitimate, Non-discriminatory Reasons

■■■■ DOLFCU and Kravetz introduced evidence in the form of Futrell's May 3, 1999 evaluation, the NCUA's 1999 follow-up examination report, and Futrell's own testimony to establish that Futrell was demoted due to her substandard performance as Manager. While Futrell's long service and record of increasing responsibilities during the course of her employment at DOLFCU are undisputed, that record of service does not transform any subsequent decisions about her performance to ones reflecting discriminatory animus, especially when Futrell found herself in a new position that was significantly more demanding than her previous ones. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir.1991) ("the issue is whether the employee was performing well at the time of his termi-

nation. Whether one is qualified may change from time to time. The fact that an individual may have been qualified in the past does not mean that he is qualified at a later time") (citations and internal quotation marks omitted).

■ In arguing that the decision to demote her was motivated by discrimination, Futrell emphasizes that she was evaluated by the Board after only ten months and that she was not given sufficient time to incorporate the new knowledge she had gained in her management training, particularly in light of the decades of service she had given to DOLFCU. However, courts are not in a position to pass on the appropriateness or inappropriateness of an employer's business decisions when there is no evidence of discrimination. *See Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir.1983) ("The question before the court is not whether the company's methods were sound, or whether its dismissal of [appellant] was an error of business judgment. The question is whether she was discriminated against"). On this record we agree with the trial court that the appellees introduced evidence of a legitimate non-discriminatory basis for demoting Futrell sufficient to shift the burden back to Futrell to prove by a preponderance of the evidence that the articulated basis for the demotion was merely a pretext for discrimination.

■ With respect to her termination, the record indicates that Futrell admitted during her deposition that she used her corporate credit card for personal purchases during the course of the summer of 1999; that she was aware that credit union employees were required to be bonded; and that when she lost her bonding through CUMIS, she did not make any attempt to obtain a bond from another insurance carrier. The record also indicates that Futrell was aware of the policy limiting the use of the corporate credit cards. Futrell argues that the bond agreement between DOLFCU and CUMIS provides no basis for terminating her bond coverage, and that Kravitz did not need to report the incident to CUMIS in the first place. We note, however, that the agreement between DOLFCU and CUMIS does include language supporting the actions taken by Kravetz on behalf of DOLFCU and CUMIS. For example, the terms of the CUMIS Credit Union Bond provide that "the Bond's coverage for an 'employee' ... terminates immediately when [the credit union] ... learns of ... [a]ny dishonest or fraudulent act committed by such 'employee' ... at any time, whether or not related to your activities or of the type covered under this Bond;" and that "CUMIS at its sole option may terminate coverage for an 'employee' ... [and] [s]uch termination will be effective 15 days after receipt by you ... of written notice of such termination from CUMIS." Thus, the bond policy clearly provides for the termination of an employee under the circumstances of this case. Therefore, based on this record evidence, we agree with the trial court that DOLFCU and Kravetz also met their burden of establishing a legitimate, non-discriminatory reason for Futrell's termination sufficient to shift the burden back to Futrell. *See Hollins, supra*, 760 A.2d at 571 (The employer satisfies its burden "by producing admissible evidence from which the trier of fact [can] rationally conclude that the employment action [was not] motivated by discriminatory animus").

### 3. Pretext

■ The burden of showing that the employer's justification was merely a pretext for discrimination merges with the employee's "ultimate burden of persuasion on the question of intentional discrimination." *Hollins, supra*, 760 A.2d at 573. Consequently, Futrell must show not only

that her substandard performance and loss of bond coverage were pretextual justifications for the demotion and termination decisions, respectively, "but also that they were a pretext for terminating [her] *because of [her] race, i.e.,* that race was the real motivating factor." *Id.* (emphasis added). Thus, she must show *"both* that the [legitimate non-discriminatory] reason was false, *and* that discrimination was the real reason." *Id.* at 571 (citations omitted) (emphasis in the original).

■ With respect to her demotion, Futrell has presented no evidence of pretext on the part of either DOLFCU or Kravetz. The evidence of her poor performance as Manager is reflected not only in her May 1999 evaluation, but also in the NCUA follow-up examination report dated September 1999. In that report, DOLFCU is taken to task for failing to decisively address problems with Futrell's performance earlier in her tenure as Manager.[12] The record also includes Futrell's own concession that she could not perform her duties as Manager at an acceptable level. In response, Futrell merely relies on conclusory statements-for example, that her former positions were filled by younger, white personnel-to support her allegations of race and age discrimination. Such con-

clusory statements are insufficient to withstand a summary judgment motion. *Knight, supra,* 725 A.2d at 478; *see also Smith v. Union Labor Life Ins. Co.,* 620 A.2d 265, 268 (D.C.1993) ("Appellant cannot rest on the general allegations of her pleadings and her failure to provide support for her contention of a material dispute will result in the court's acceptance of a movant's statement as undisputed absent clear support for any such contention from the record") (citations and internal quotations omitted).

■ Concerning her termination, Futrell argues that Kravetz made "deliberate false misrepresentations to CUMIS" with respect to her use of the corporate credit card. However, she provides no evidence of such misrepresentations. In fact, evidence was presented that Futrell failed to respond to the two opportunities she had to provide documentation to DOLFCU and then to CUMIS concerning her personal use of the corporate card. Moreover, her deposition testimony is again damning in that Futrell conceded that during the summer of 1999, she had made personal charges on her corporate credit card, and indicated her awareness that federal credit

---

12. The record also indicates that the DOLFCU Board faced extensive criticism from NCUA in its September 1999 Follow-up Examination Report for the Board's failure to act swiftly and decisively with respect to Futrell's demotion and termination. In that report, NCUA indicated that the Board's indecisiveness threatened the credit union's future, and no better example existed to illustrate the point than its "handling of the former manager." According to NCUA, when the Board passed a vote of "no confidence" in Futrell, "the next step probably would have been to terminate the manager with or without severance pay," rather than reassigning her without a reprimand at a comparable salary, which it found amounted to "effectively reward[ing] poor performance." NCUA also noted other deficiencies in Futrell's perfor-

mance that should have resulted in decisive action. For example, Futrell failed to reduce the credit union's second quarter dividend rates as required by Board resolution and then "misinformed the board as to the current rates." As a consequence of her actions, DOLFCU incurred additional dividend expenses in the amount of approximately $25,000. In addition, NCUA indicated that Futrell had failed to charge-off loans that had been classified as losses and approved by the Board for charge-off during the April 1999 through July 1999 period. With respect to Futrell's unauthorized use of her corporate credit card for personal purchases, NCUA again criticized the Board for its indecisiveness, concluding that "[f]ortunately, the information was appropriately forwarded to the bonding company."

union employees are required to be bonded as a condition of employment.

## C. Wrongful Discharge/Breach of Contract

Futrell argues that the trial court erred in granting summary judgment on her wrongful discharge claim since she presented sufficient evidence to create a material factual issue as to whether she had entered into an implied employment contract with DOLFCU, based on representations made in DOFLFCU's Employees' Handbook and its Employee Guidebook or through representation made by Kravetz in letters dated July 8, 1999 and August 19, 1999. The trial court, after reviewing both documents, concluded that the Employees' Handbook was a union contract which extended certain grievance procedure privileges to non-managerial employees, not management-level employees such as Futrell and that the Employee Guidebook failed to create an implied contract of employment, because "nothing in the Employee Guidebook either suggests or implies that the credit union committed itself to abiding by a particular procedure before it terminated an employee," and "boldfaced disclaimers pervade the document serving to put all employees on notice that their status remains that of employees-at-will." Finally, the trial court concluded that the letters from Kravetz failed to establish an implied employment contract. We agree.

In the District of Columbia, we recognize the presumption that "a hiring not accompanied by an expression of a specific term of duration creates an employment relationship terminable at will by either party at any time." *Strass v. Kaiser Found. Health Plan,* 744 A.2d 1000, 1011 (D.C.2000); *Perkins v. District Gov't Employees Fed. Credit Union,* 653 A.2d 842 (D.C.1995). But this presumption can be rebutted by a showing that "the parties intended that termination be subject to specific preconditions." *Strass, supra,* 744 A.2d at 1011. Moreover, "the terms of an employer's personnel or policy manual may be sufficient to raise a jury question as to whether the manual creates contractual rights for the employee ... [since] contractual rights may arise from language in employee manuals." *Id.* However, such implied contractual rights can be disclaimed, and "the legal effect of such a disclaimer is, in the first instance, a question for the court to decide." *Id.* at 1011.

With respect to the Employees' Handbook, the trial court did not err in concluding that it was only intended to extend to non-managerial employees. The document distinguishes between "employee" and "Manager," and it is the "employee" that enjoys the grievance rights under a collective bargaining agreement that Futrell attempts to assign to herself. In addition, her expert also testified that the Guidebook, which includes the disclaimer, not the Handbook, was the most current version of DOLFCU's policy and procedures manual.

The trial court's legal conclusion that the May 1998 Employee Guidebook did not create an implied employment contract is also supported by the evidence. The Guidebook clearly states in boldfaced print that it "does not constitute an expressed or implied employee contract," and also provides that "[e]mployees may terminate their employment with the credit union any time, for any reason, and may be terminated by the credit union any time, for any reason, with or without notice." The inclusion of such unambiguous language and the lack of any specific preconditions in the Guidebook that must be met before employment will be terminated supports the conclusion that Futrell's arguments is without merit and summary judgment was properly granted. *See*

*Dantley v. Howard Univ.,* 801 A.2d 962 (D.C.2002); *see Roberts v. Howard Univ.,* 740 A.2d 16, 19 n. 1 (D.C.1999).

Moreover, the record indicates that Futrell, herself, testified during her June 8, 2000 deposition that she understood that the Employee Guidebook did not create an express or implied employment contract. She also testified that she was not given a written contract when she assumed the position of Manager in July 1998, and that she was not given any indication that she would remain in the position for a specified period of time or under what circumstances she would be terminated.

██ Futrell's final argument, that Kravetz's July 8, 1999 and August 19, 1999 letters created implied contracts of employment, is also unavailing. In the July 8, 1999 letter, the DOLFCU Board demanded Futrell's resignation as Manager, and presented her with two options-severance pay or a demotion and reassignment to an Assistant Manager position-in view of her "prior contributions and many years of service to the Credit Union." This letter was subsequently withdrawn on August 19, 1999. In a letter dated the same day, DOLFCU decided that the reassignment would be her only option. Such letters certainly do not constitute "an expression of a specific term of duration" triggering contractual rights. *See Strass, supra,* 744 A.2d at 1011.

██ We conclude that none of the evidence presented-the Handbook, Guidebook or the letters-created an express or implied employee contract and, thus, the trial court did not err in concluding that Futrell was an at-will management employee, who could be discharged at any time and for any non-discriminatory reason. Since the District of Columbia does not recognize

the tort of wrongful discharge for at-will employees, unless the employee was discharged for refusing to violate public policy, *Smith, supra,* 620 A.2d at 269, summary judgment was properly granted on this issue.

**D. Tortious Interference with Employment Rights**

██ The trial court also granted summary judgment on Futrell's claim that Kravetz and CUMIS conspired to interfere with her employment relationship with DOLFCU by scheming to have her bond coverage terminated. The trial court concluded that even in the event that appellant had established an implied contract of employment, she provided no evidence that either Kravetz or CUMIS intentionally interfered with her purported contract with the credit union. Establishing a prima facie case of intentional interference with contractual relations requires that Futrell show "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach." *Paul, supra,* 754 A.2d at 308–09; *Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813, 819 (D.C.1991); *Sorrells v. Garfinckel's,* 565 A.2d 285, 289 (D.C.1989). If a prima facie case is established, DOLFCU then has the burden to show "that ... [its] conduct was legally justified or privileged." *See Sorrells, supra,* 565 A.2d at 289–90.[13] Given our conclusion that no employment contract-express or implied-existed between Futrell and DOLFCU, she cannot establish a prima facie case of intentional interference with contractual relations and, thus, the trial court did not err in granting sum-

---

**13.** Conduct is "privileged" if carried out "in order to protect a present, existing economic interest." *See Raskauskas v. Temple Realty*

*Co.,* 589 A.2d 17, 27 (D.C.1991) (citation and internal quotation marks omitted).

mary judgment on this issue as a matter of law.

### E. Intentional Infliction of Emotional Distress

Appellant next argues that the trial court erred in granting summary judgment on her intentional infliction of emotional distress claim based on appellees' conduct with respect to her demotion and termination. Establishing a prima facie case of intentional infliction of emotional distress requires a showing of "(1) extreme and outrageous conduct on the part of the defendant[s], which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Paul, supra,* 754 A.2d at 307 (citation and internal quotation marks omitted). We have been exacting as to the proof required to sustain such claims "in an employment context." *Id.* The conduct alleged must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Id.* at 307–08. A case should go to the jury if "reasonable people could differ on whether the conduct is extreme and outrageous." *Howard Univ. v. Best,* 484 A.2d 958, 985 (D.C.1984).

Based on our conclusion that summary judgment was properly granted on Futrell's other claims related to her demotion and termination, we conclude that her intentional infliction of emotional distress claim predicated on those same claims is without merit. Moreover, during her deposition, Futrell testified that DOLFCU's allegedly discriminatory conduct caused her "mental anguish" and "stress." Even if Futrell had been successful in establishing any of the other claims related to her demotion and termination, "mental anguish" and "stress" would not rise to the level of the "severe emotional distress"

required by the case law. *See Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.1982), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982) ("the defendants' actions must proximately cause the plaintiff emotional upset 'of so acute a nature that harmful physical consequences [are likely] ... to result' "). Thus, Futrell has failed to present any factual disputes requiring resolution by a trier of fact at trial.

### III.

In August 2000, Futrell filed a Motion to Compel Discovery requesting, among other documents, DOLFCU collective bargaining agreements from 1994 to 1999 and a complete version of the NCUA examination reports for the same period which, she argues, would show that the Board was responsible for the credit union's management problems. In an October 2000 order, the trial court denied the motion with respect to the collective bargaining agreements, concluding that such agreements do not govern managerial employees such as Futrell. With respect to the NCUA examination reports, the trial court took the matter under advisement. On appeal, Futrell argues that she was prejudiced by the trial court's decision regarding the collective bargaining agreements and its failure to rule regarding the NCUA examination reports. With respect to the NCUA reports, DOLFCU counters that the credit union is prohibited by a federal regulation—12 C.F.R. § 792.40—from producing copies of the reports, and that Futrell had the option of requesting the reports through the prescribed channels.[14]

Super. Ct. Civ. R. 26(b)(1) provides that "[p]arties may obtain discovery

---

**14.** By January 2001, DOLFCU had received authorization from NCUA to use the 1999 NCUA follow-up examination report at trial.

regarding any matter, not privileged, which is relevant to the subject matter of the action." *Roberts–Douglas v. Meares*, 624 A.2d 405, 414–15 (D.C. 1992). This court has held that "[r]elevancy to the subject matter is construed most liberally, to the point that discovery should be granted where there is any possibility that the information sought may be relevant to the subject matter of the action." *Id.* at 415. We review the trial court's discovery rulings for abuse of discretion. *Id.* Pursuant to Super. Ct. Civ. R. 37(a)(2), "the discovering party may move for an order compelling an answer" in the event "a party fails to answer an interrogatory [submitted under Rule 33.]" *Haynes v. District of Columbia*, 503 A.2d 1219, 1224 (D.C. 1986). Trial courts enjoy "broad discretion in determining whether to grant or deny a motion to compel discovery," and the trial court's decision will not be reversed on appeal "unless there has been an abuse of discretion resulting in prejudice." *Haynes, supra,* 503 A.2d at 1224 (citing *White v. Washington Metro. Area Transit Auth.*, 432 A.2d 726, 728–729 (D.C. 1981)).

■ We conclude that the trial court did not abuse its discretion in ruling that the collective bargaining agreements were not probative. Futrell conceded during her deposition that the collective bargaining agreements do not apply to her because she was employed in a management position. Thus, the agreements are not relevant to her claims. *See White, supra,* 432 A.2d at 729 (requested discovery must be relevant).

■ With respect to the NCUA examination reports, the trial court never made a ruling, deciding instead to take the matter under advisement as indicated in its oral ruling and its October 2000 order. During oral arguments before this court, Futrell argued that the trial court's summary judgment ruling was premature because a complete version of the NCUA reports had not been produced. However, there is no evidence in the record indicating that she argued to the trial court that its outstanding ruling should preclude a grant of summary judgment in favor of DOLFCU. Since this prematurity argument was not raised before the trial court, we cannot entertain it on appeal. *See Urban Masonry Corp. v. N & N Contractors, Inc.*, 676 A.2d at 32 n. 12 (D.C.1996) (prematurity of grant of partial summary judgment was not argued before trial court and, thus, cannot be raised on appeal).

Accordingly, the judgment of the trial court is

*Affirmed.*